1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - -   X

WATSON,                        :
                                        CV 06-2212
        Petitioner             :


            -against-          :
                                        United States Courthouse
                                        Brooklyn, New York
GREENE                         :
                                        July 16, 2009
        Respondent.           :         12:00 o'clock noon

- - - - - - - - - - - - -   X


                    TRANSCRIPT OF ARGUMENT
            BEFORE THE HONORABLE CAROL BAGLEY AMON
                UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Petitioner:           WILLIAM CARNEY, ESQ.


For the Respondent:           ANNE FEIGUS, ESQ.


Court Reporter:               Gene Rudolph
                              225 Cadman Plaza East
                              Brooklyn, New York
                              (718) 613-2538


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

GR      OCR      CM      CRR      CSR

1          THE CLERK:  Watson versus Greene, 06 CV 2212.

2          THE COURT:  Good afternoon.

3          MR. CARNEY:  Good afternoon.

4          MS. FEIGUS:  Good afternoon, Your Honor.

5          THE COURT:  We have Ms. Feigus and Mr. Carney.

6          Mr. Carney, why don't I hear from you first.

7          I have a couple of questions.  Let me just ask this

8     as an initial matter.  Is the real claim here that the

9     confrontation right was violated, or is it more in the nature

10    of precluding a defense?

11         MR. CARNEY:  Well, I think they are interrelated,

12    Your Honor, by the fact that we couldn't cross-examine the

13    detectives about their failure to pursue this lead and do a

14    thorough investigation in the case.  We couldn't present our

15    defense raising a reasonable doubt in the minds of the jurors,

16    that the police had had a kind of tunnel vision on the

17    petitioner and not fully followed every lead pointing to other

18    suspects.

19         In this case, the one other suspect, Keemie Harvey,

20    when they had this document, this memo, provided by a police

21    officer in the detective's file, indicating that Harvey had

22    been the shooter and that the gun had gone off accidentally.

23    This information it turns out, according to the prosecutor,

24    came from Harvey's mother.  And if you look at the statement

25    itself, I think that the defense could have made great impact

1   with the jury with the idea that this statement had the

2   classic marks of reliability and a statement against penal

3   interest in the sense that --

4         THE COURT:  No.  You are not arguing that the

5   statement itself would have come in -- you've never argued

6   that it would come in as affirmative evidence that Harvey had

7   the gun.

8         MR. CARNEY:  Well, I think that to the extent

9   that -- that the statement -- had we been able to establish,

10  as came out not in front of the jury but in discussions with

11  the prosecutor, that this statement was provided by Harvey's

12  mother and that the statement itself, even if not offered for

13  the truth, it does have somebody saying, I did it but it went

14  off accidentally, in offering some sort of mitigating

15  circumstance.

16        The fact that we weren't given the statement in time

17  to do our own independent investigation and contact Officer

18  Pierce or Rakeem Harvey --

19        THE COURT:  You had all of that information prior to

20  the end of trial.  In other words, you had the ability to call

21  the Pierces, if you wanted.  They had talked to people.  What

22  their information was was out there.  But that goes more to

23  your Brady issue.

24        MR. CARNEY:  That does go more to the Brady issue.

25  I feel that the three -- there are three aspects of prejudice

4

1 here. That's the Brady issue, whether we were materially

2 prejudiced by what we feel is an untimely and incomplete

3 disclosure of this memo. One is that we are not given the

4 opportunity to fully investigate this information prior to a

5 time when it has become clear to the Harvey family that he is

6 no longer the primary suspect.

7         Initially, it appears --

8         THE COURT: Why are you entitled to that kind of

9 timing? You'd be entitled -- you could argue that you should

10 be entitled to have it prior to trial so you can investigate

11 everyone. What would give you the right to have it before

12 Harvey understood or his parents understood that he was a

13 suspect? I don't see that kind of --

14         MR. CARNEY: The case law says that the prosecution

15 is obligated to turn over material, exculpatory documents, at

16 the earliest possible opportunity and at a time when these

17 documents can be used by the defense. That's also the rule

18 of --

19         THE COURT: I understand that.

20         It depends on what you mean by "used by the

21 defense." I don't think -- assuming they gave it to you a

22 year before but Harvey had already been identified and his

23 family was concerned about it, and if they had have given it

24 to you a year before and one month right in that interim

25 before they knew about Harvey's involvement, are you

5

1   contending that it wouldn't have been given to you in enough

2   time?  I don't think that timing -- the kind of thing that you

3   are talking about, that somehow maybe if you had gotten it

4   earlier Harvey's parents wouldn't have known.  I don't find

5   that persuasive.

6           Let me ask you another question.  Harmless error can

7   apply.  Do you agree with that?  These are not structural

8   errors.

9           MR. CARNEY:  It doesn't -- well, under Brady there

10  is no such thing as harmless error -- as harmless error.  But

11  the harmless error is kind of incorporated in the first

12  instance because you have to establish that it's material and

13  prejudicial in the first instance.  So -- in doing that,

14  courts look to the same standard.  I know this is one of your

15  questions as well.  That goes to our denial of the right to

16  present a defense in confrontation, which is now clear.  The

17  Supreme Court has issued a relatively recent decision on this,

18  that it's the Brecht v. Abramson standard.

19          THE COURT:  You agree, that whether we call it

20  confrontation, failure to present a defense, Brady, however

21  you want to characterize the violation, the same Brecht

22  harmless error standard applies; is that correct?

23          MR. CARNEY:  That is correct.

24          So whether or not the -- had the evidence been

25  disclosed it would have cast the case in a different light and

1  had a reasonable probability of creating a different verdict,

2  the one thing that is special to the denial of our right to

3  confrontation, which goes to the prejudice component, before

4  you reach harmless error is under Delaware v. VanArsdall, in

5  assessing the prejudice of the Court's denial of our right to

6  present a defense or to confront the detectives about their

7  failure to pursue this information, the Court is supposed to

8  assume that the damaging potential of cross-examination would

9  have been fully realized.

10        It's interesting in this case that we did have

11  Detective Bond, the lead detective, appear outside of the

12  jury's presence and when asked, did you ever confront Rakeem

13  Harvey with this information in a memo or why didn't you talk

14  to his family, he said oh, I knew that he had the gun.  I had

15  that information.

16        Now, that is kind of a curious bit of testimony,

17  since the defendant was then the one facing first degree

18  murder charges and Harvey was testifying under a very

19  advantageous cooperation agreement.

20        If the detective was just being facetious or

21  flippant in his response, that would have been something that

22  the defense would have been very interested in presenting to

23  the jury as well, because that would have supported their

24  contention that they didn't seriously follow this lead.

25        THE COURT:  Another question that I asked was this.

7

1    A habeas is equitable relief.  This piece of evidence that you

2    wish to get in that you were not able to get in and what I

3    think you could have gotten in was the cross-examination of

4    the police officer.  I don't know that the note would have

5    come in, but the cross-examination of the police officer, that

6    he had this information and that he didn't do anything about

7    it, seems like to me, you should have been able to put that

8    information in under Kyles and the cases such as that.

9            This testimony, I take it, went to the issue of the

10   first degree murder, who had the gun?

11           MR. CARNEY:  Correct.

12           THE COURT:  Because, as I understand it, you did not

13   contest that Mr. Watson was there or that he was part of a

14   robbery.

15           MR. CARNEY:  Correct.

16           THE COURT:  Assuming you prevail on this, why isn't

17   your remedy a remand for resentencing on second degree murder?

18           MR. CARNEY:  Because a related defense, there was

19   also a charge -- lesser charge of second degree murder under

20   the theory that petitioner was present but he wasn't the

21   shooter, and that he wasn't aware, the affirmative defense to

22   second degree felony murder under New York law, that he wasn't

23   aware that Harvey had a gun and the jury would never have

24   gotten to that issue if they accepted that petitioner had been

25   the shooter in the first instance.

1          Had we been able to raise a reasonable doubt on that

2     issue the jury would still have -- had to deliberate on this

3     second issue, which is the second degree murder charge under

4     the affirmative defense.

5          THE COURT:  That wasn't affirmative evidence,

6     that -- the note itself wasn't affirmative evidence that

7     Harvey in fact had the gun.

8          MR. CARNEY:  It could have raised a reasonable doubt

9     to the issue that he had the gun, which is something that the

10    jury had to find as a necessary prerequisite to then reaching

11    the second degree murder.  So it did -- it did have a strong

12    impact on our defense to that issue as well.

13         THE COURT:  Assuming the jury would have concluded

14    that -- the best the jury could have concluded, I guess, from

15    the admission of the evidence was that there was reasonable

16    doubt that Watson had the gun.  Because it wasn't -- super

17    technical, I guess -- but it did not constitute affirmative

18    evidence, that Harvey had the gun.

19         Had Harvey been on trial, that evidence could not

20    have been used to establish --

21         MR. CARNEY:  I don't think the jury would have been

22    unreasonable -- of course, you never know what facts the jury

23    is reaching in acquitting somebody of the top charge in this

24    case, that petitioner was the shooter.  But the jury

25    wouldn't -- first of all, that wasn't a necessary prerequisite

9

1  for them to reach the second degree charge.  And since the

2  statement itself, and the police officer's failure to pursue

3  that could raise reasonable doubt, that meant that they could

4  reach that second issue but they never got a chance to really

5  deliberate on it as the case was presented to the jury in this

6  instance and so it can't just be remanded for a sentencing on

7  that because it was an issue that the jury never reached in

8  this case.

9         THE COURT:  What about the armed robbery?  He

10  admitted in his --

11         MR. CARNEY:  He admitted the armed robbery but the

12  jury -- part of the armed robbery is that the defendant

13  doesn't have the gun.  So that -- that petitioner doesn't have

14  the gun.  So if --

15         THE COURT:  He admitted he was guilty of armed

16  robbery.

17         MR. CARNEY:  He admitted he was guilty of armed

18  robbery.  We have the affirmative defense which the jury would

19  never be deliberating on if --

20         THE COURT:  That's not an affirmative defense.  If

21  he is part of a robbery where the other person has the

22  gun -- he admitted to the jury that he was guilty of armed

23  robbery.

24         MR. CARNEY:  That his statement, the

25  defendant's -- petitioner's statement is that Harvey had the

GR      OCR      CM      CRR      CSR

1  gun and he pulled it off -- he pulled it out and shot Morris

2  and that the defendant -- petitioner was not aware of that.

3        Under New York law, that's -- that's the affirmative

4  defense to felony murder.  If you are participating in a

5  robbery but you are unaware the other person has a gun --

6        THE COURT:  Is it an affirmative defense to

7  participating in an armed robbery as well, that you knew you

8  were participating --

9        MR. CARNEY:  For the second degree murder charge.

10        THE COURT:  No.  I am talking about just the armed

11  robbery.  He was charged with armed robbery as well, right?

12        MR. CARNEY:  Okay.  So, yes, he -- they would -- he

13  would be guilty of armed robbery under this.  But not second

14  degree murder.

15        THE COURT:  Okay.  What is the sentence for armed

16  robbery?

17        MR. CARNEY:  Offhand, I -- eight -- I am not sure.

18        THE COURT:  I know the state wouldn't agree.  I

19  presume the state wouldn't agree to this.  But if habeas was

20  granted, could it be remanded for a sentencing on armed

21  robbery based on his admissions?

22        MR. CARNEY:  I think so, yes.

23        Just one other thing.  A related part of our

24  prejudice analysis is that then because this information and

25  the police failure to follow this lead was never presented to

1    the jury in any way, the prosecutor was really able to exploit

2    that in their summation in making arguments for petitioner's

3    guilt saying, did the police not fully follow every lead, did

4    not every lead point to petitioner, didn't they do an

5    excellent and thorough investigation in this case?

6              The very thing that we wanted to undermine them on,

7    they were able to talk to the --

8              THE COURT:  Where does that fit in?  You don't have

9    a summation claim here.  That fits in on the harmless error

10   theory?

11             MR. CARNEY:  It goes to the prejudice and harmless

12   error.  It's the United States v Gil case, the Second Circuit

13   case that we cite in our brief.  They -- the Court there

14   states explicitly that in instances like this, where the Brady

15   material, that you are not allowed to refer to that, if that's

16   then touted in the summation, that exacerbates the prejudice

17   or the flip side of it, the harmless error analysis.

18             THE COURT:  Assuming this was error -- another thing

19   to look to is the strength of the evidence.  Correct?

20             MR. CARNEY:  Correct.

21             THE COURT:  So you have an eye -- we have someone

22   who indicates that they saw Watson with the gun at the scene.

23   Then, of course, you have Harvey's testimony.  So you have an

24   accomplice and then you have that accomplice corroborated by,

25   I believe -- corroborated as to the fact that he was the one

1   that was with the gun by the witness Jean-Louis.  Why isn't

2   that very strong evidence?

3           MR. CARNEY:  Harvey obviously is a witness with very

4   strong interest in the case, testifying under a cooperation

5   agreement.  He's actually the only person who says that

6   petitioner is the shooter.

7           Even the one eyewitness who claims that petitioner

8   has a gun is not saying he's the shooter.  He sees the gun in

9   his hand.  It's circumstantial but he's the one witness.  He's

10  also the witness who is unable to identify petitioner at the

11  lineup and then he says --

12          THE COURT:  What he says about the petitioner is

13  consistent in terms of his description of him with other

14  witnesses who did pick him out of the lineup.

15          MR. CARNEY:  There were some conflicts between the

16  witnesses.  Harvey in his -- in his account of the incident

17  never admits that he's the guy who says give it up, give it

18  up, and the more you resist, the worse it will be.

19          Although that's what Ramcess Jean-Louis said.  That

20  was his role in the statement.  With Jean-Louis, his testimony

21  tended over the course of time to -- to evolve into something

22  that more and more fit into the pattern of the prosecution

23  case.

24          As the Supreme Court has said in identification

25  cases, like Manson v Brathwaite or Kyles v Whitley, that part

1   of the cornerstones of identification is reliability and

2   always having the same statement.

3          He denied that he said I failed my friend after he

4   failed to pick out petitioner at the lineup.

5          He denied that in several of his earlier statements

6   he was -- that he didn't have petitioner wearing the gray

7   sweat suit, which was an important part of the identification

8   of the man having the gun at the trial.

9          He also claimed that he had also described

10  petitioner as having a long droopy face, but that wasn't in

11  any of his prior statements and with -- when confronted with

12  those, he seemed to be very much following a script in making

13  these assertions.  But there were prior inconsistencies in his

14  statement.

15         THE COURT:  How about between Jean-Louis and the

16  testimony of other witnesses?

17         MR. CARNEY:  Well, other witnesses --

18         THE COURT:  Curt Phillips and Stephens-Prince, for

19  instance?

20         MR. CARNEY:  Stephens-Prince said the man towards

21  the rear of the car, which is where Rakeem Harvey said he was

22  standing, was leaning in and saying give it up, give it up.

23  But his trial testimony was also saying that the one leaning

24  in was wearing the gray sweatshirt and was light skinned and

25  that was petitioner.

1          Loren Hillery -- Loren Hillery couldn't tell who was

2     wearing what, who was the one in the gray sweatshirt, who was

3     the light skinned one, who was the dark skinned one.

4          In the case of all these witnesses, there seemed to

5     be evolution in their ability to identify, where suddenly at

6     trial they were providing much greater details and more

7     consistent details than they had given in their initial

8     statements to the police.

9          THE COURT:  Let me ask you a question, something

10    that I don't know about state law.

11         He was charged with all these different offenses.

12    But the Court told them to return a verdict on the first

13    offense first and the jury never reached a verdict as to the

14    others?  Is that standard practice?

15         MR. CARNEY:  Yes, yes.  They -- the Court will

16    instruct them to consider the first degree murder charge and

17    only go on, in this case, to second degree if they acquit him

18    of the first degree.

19         THE COURT:  What about the armed robbery and all

20    that?  Why don't they deliberate on those charges?  Are they

21    all lesser included?

22         MR. CARNEY:  They are lessers in this instance.

23         THE COURT:  They are all lesser included of the

24    first degree murder?

25         MR. CARNEY:  First degree murder, felony murder

1   charge in this case.

2        THE COURT:  That's why, for instance, you believe it

3   would be appropriate, assuming the state agreed, which I doubt

4   that they will, but to, as an equitable matter, instead of

5   granting a new trial per se, to just direct that he be

6   resentenced on the armed robbery?

7        MR. CARNEY:  That's correct, Your Honor.

8        Everybody -- I mean, both Harvey and petitioner

9   admitted ultimately that they were involved in an armed

10  robbery, although part of our contention is that Harvey kind

11  of minimalized his participation.

12       THE COURT:  It wasn't agreed he participated in an

13  armed robbery.  Why does he plead guilty to second degree

14  murder under that theory?

15       MR. CARNEY:  Harvey?

16       THE COURT:  No.  You were saying everybody agreed

17  that they were in an armed robbery.  But if that's the case --

18       MR. CARNEY:  Because he has to know that the other

19  person has a gun.

20       THE COURT:  If he admits he's involved in armed

21  robbery, he's admitting that the other person had a gun.

22       MR. CARNEY:  Well, then maybe in a robbery where

23  there are two people involved, but he is not admitting it's an

24  armed robbery.

25       THE COURT:  Then it couldn't be remanded for armed

1  robbery?  Even though he told the jury that hey, I am guilty

2  of armed robbery?

3  　　　　　MR. CARNEY:  His statement was that he didn't know

4  that -- that Harvey had a gun.  So I guess he didn't

5  admit -- he admitted he was involved in a robbery but not in

6  armed robbery.

7  　　　　　THE COURT:  What was he charged with?

8  　　　　　MR. CARNEY:  He was charged with felony murder.  The

9  idea that he was in a robbery and in this --

10  　　　　　THE COURT:  That was the second degree murder

11  charge?

12  　　　　　MR. CARNEY:  Second -- second degree murder, yes.

13  　　　　　THE COURT:  That wouldn't have necessarily been

14  based on a felony murder theory.

15  　　　　　MR. CARNEY:  I believe it was.  I don't have the

16  indictment.

17  　　　　　THE COURT:  In other words, he was -- as the shooter

18  he was guilty of first degree?

19  　　　　　MR. CARNEY:  Right.

20  　　　　　THE COURT:  Second degree would have been the felony

21  murder theory?

22  　　　　　MR. CARNEY:  Felony murder, and if he was not aware

23  that the other person had a gun.

24  　　　　　THE COURT:  Then what is he guilty of?

25  　　　　　MR. CARNEY:  He was not guilty of felony murder.

1          THE COURT:  What about armed robbery?

2          MR. CARNEY:  I am not sure that he -- I am not sure

3    about that.

4          THE COURT:  Then you are --

5          MR. CARNEY:  It could be a robbery.  There is a

6    robbery where there are two or more people involved in a

7    robbery.  That could be the basis of the robbery.

8          THE COURT:  Do you remember what the specific

9    robbery charge was?

10          MR. CARNEY:  I don't.  I don't have the indictment

11    with me.

12          THE COURT:  All right.  Ms. Feigus, I will hear from

13    you.

14          Ms. Feigus, assuming that I concluded that this was

15    a problem, that the note should -- there should have been

16    permitted to be testimony about the note and it wasn't

17    harmless error, what's the relief?

18          MS. FEIGUS:  Your Honor, we have researched this in

19    the Appeals Bureau.  I am sorry, I don't have my penal law.

20          The defendant was charged with two counts of first

21    degree robbery.  The remanding it for resentencing on the

22    second degree murder I believe is problematic because the

23    defendant requested the affirmative defense.  His claim was

24    that he did not know that Rakeem Harvey had a gun.  He denied

25    he was the shooter and he said -- he claimed did he not

18

1   know -- in his last statement, that he didn't know Rakeem

2   Harvey had the gun.  So the jury did not have an opportunity

3   to deliberate on that charge.

4              THE COURT:  Okay.  What about the robbery?

5              MS. FEIGUS:  The robbery, I -- I do have the -- I do

6   have the Court's charge here.  The Court did charge -- of

7   course, they didn't deliberate on the first -- on the first

8   degree robbery either.  It's the charge that the -- the

9   Court's charge basically said the People had to prove these

10  two elements, that he forcibly stole property from Patrick

11  Morris on July 12, 1998, and that in the course of the

12  commission of the crime the defendant or another participant

13  caused serious physical injury to Patrick Morris.

14             THE COURT:  He admitted all of that.

15             MS. FEIGUS:  Yes.  But that --

16             THE COURT:  But he couldn't be -- he couldn't be

17  remanded -- couldn't be -- his first degree and second

18  degree --

19             MS. FEIGUS:  If they were found -- if the theory is

20  acting in concert, they wouldn't necessarily have --

21             THE COURT:  Doesn't say --

22             MS. FEIGUS:  It just seems -- if the jury -- the

23  jury did find, here the jury -- it is clear, the jury did find

24  that the defendant was armed and that the defendant was the

25  shooter.

19

1          THE COURT:  Right.

2          MS. FEIGUS:  The --

3          THE COURT:  Assuming that they didn't have the piece

4    of information that they had --

5          MS. FEIGUS:  That they didn't?

6          THE COURT:  Didn't have, they could have well had a

7    reasonable doubt, let's say, that he was the shooter.  That's

8    what the information -- it wouldn't have established

9    affirmatively that Harvey had the gun.

10         MS. FEIGUS:  Your Honor, may I?

11         THE COURT:  Yes.

12         MS. FEIGUS:  The evidence in this case

13   overwhelmingly established that Darrell Watson was the

14   shooter.  May I address that?

15         You asked Mr. Carney about the testimony of Ramcess

16   Jean-Louis who put the gun in the defendant's  hand.  I would

17   just like to go through the quantum of evidence in this case

18   that proved that he was in fact the shooter here.

19         First, the People presented a witness.  Rakeem

20   Harvey testified that he and the defendant were on their way

21   to a party.

22         THE COURT:  Okay.  He basically testified that it

23   was Watson who had the gun.

24         MS. FEIGUS:  Right.

25         But we have a -- we had a witness, Freddy Burns --

20

1          THE COURT:  Who saw him at a party.

2          MS. FEIGUS:  Shortly before the crime lifting up his

3    waistband and flaunting a gun.

4          When the defense -- after they cross-examined

5    Ramcess Jean-Louis, the defense put in three

6    documents -- three pieces of evidence that they argued

7    impeached his identification -- Mr. Jean-Louis's

8    identification of defendant as the person who was holding a

9    silver revolver in his right hand.

10         I looked through our file, which is voluminous, and

11   I had actually called Mr. Carney about this.  I thought it

12   might elucidate something.  And I have a copy of these

13   documents for Your Honor, if I may.

14         THE COURT:  Is it something in the court record?

15         MR. CARNEY:  Yes.

16         MS. FEIGUS:  Yes.

17         THE COURT:  Okay.

18         MS. FEIGUS:  Your Honor, they sought to impeach

19   Mr. Jean-Louis on the basis of a DD-5 that a -- statements

20   that he made to a police detective on the precise day that the

21   crime was committed.  Their claim is -- their argument is that

22   because Mr. Jean-Louis was confused about which of the two

23   perpetrators was wearing the gray sweatshirt, his -- his

24   identification lacks reliability.

25         But there are certain facts in this case that are

1   undisputed by defendant's very admissions.  There were only

2   two perpetrators here.  They had very distinctive physical

3   appearances.  One was substantially -- they were both

4   African-American males.  One was substantially darker skinned

5   than the other.

6            THE COURT:  I understand that the light skinned guy

7   was the one that Mr. Jean-Louis said had the gun.  Even though

8   Jean-Louis didn't put the sweatshirt on him at one time, all

9   the other witnesses put the sweatshirt on the light skinned

10  guy and the sweatshirt was found in his place.

11           MS. FEIGUS:  But, Your Honor, there is another

12  aspect of the evidence in this case, which comes from the

13  defendant's very own mouth, that is damning evidence of his

14  consciousness of guilt.

15           First, after he was -- he dropped his -- as you

16  know, he dropped his wallet at the scene, took the victim's

17  cellphone and was making calls to the cell -- to friends,

18  numbers in his wallet, on the victim's cellphone.

19           THE COURT:  That means he is there.  I am talking

20  about overwhelming evidence of the guilt that he shot him.

21           MS. FEIGUS:  Yes, Your Honor.

22           THE COURT:  Nobody is disputing he was there.

23           MS. FEIGUS:  Right.

24           The first -- the first thing he told the police,

25  he -- if -- if Darrell Watson had said from the get-go in this

1 | case, Keemie Harvey had the gun, it would be a very different

2 | case.  But that is not what happened here.

3 | First he said he bought the phone from a person.

4 | Went to a playground with the police.  They arrested that

5 | person.  Jason --

6 | THE COURT:  I know.  He goes through a series.  Only

7 | when he gets to the third time does he put the gun in --

8 | MS. FEIGUS:  Yes, Your Honor.  But more than that,

9 | Your Honor.

10 | In the second statement he accuses a completely

11 | innocent person of being the shooter, a man named Jahad Grant.

12 | Not only does he say Jahad Grant was the shooter and pulls the

13 | gun out of a paper bag, he dresses him in precisely the same

14 | clothes that he was wearing.

15 | He knew that three people or four people rushed

16 | outside after this single shot was fired.  He knew that they

17 | had seen him and Rakeem Harvey.  There is no -- no dispute

18 | that he was wearing glasses, that he was light skinned and

19 | that he was wearing this gray sweat suit with a Tommy Hilfiger

20 | logo.

21 | If Darrel Watson made Jahad Grant the shooter and

22 | dressed him exactly as he had been dressed, he didn't make

23 | Keemie Harvey the shooter.

24 | And he also in that statement lied about -- he said

25 | he was wearing a T-shirt and beige pants.  He took a

23

1    completely innocent person and made that person the shooter,

2    dressed him in his clothes, and attributed the clothing and

3    the role in the crime to Rakeem Harvey that Rakeem Harvey

4    consistently said that he played.

5         Only after Jahad Grant was not identified by three

6    of the -- I won't call them eyewitnesses because they didn't

7    actually -- they were there within seconds after hearing the

8    shot.  Only then did he put the gun in Keemie Harvey's hands.

9         That statement -- it's not just the statement, that

10   Jahad Grant was the shooter.  Defendant portrayed himself as

11   the lookout.  That is damning evidence of consciousness of

12   guilt.  He dressed him exactly as he had been dressed.

13        From the get-go, Ramcess Jean-Louis said the man, as

14   you will see in the DD-5 that I handed up to the Court, that

15   the man with the glasses, the light skinned man with the

16   glasses, was holding the silver revolver.

17        So you -- it's an odd circumstance.  You don't just

18   have the testimony that the defendant had the gun shortly

19   before the crime, a very distinctive looking gun.  You have

20   the testimony that Ramcess Jean-Louis sees the silver revolver

21   in his right hand, that he was the one who engaged in

22   conversation with Mr. Jean-Louis.  That was corroborated by

23   Mr. Hillery and Mr. Phillips.  But you have the defendant

24   concocting a scenario where he takes a person who is

25   completely innocent of this crime and makes that man, that

24

1    innocent man, the shooter.

2            THE COURT:  All right.  Let me ask you about another

3    question.

4            Do you agree at this point in the proceeding that it

5    was error to exclude cross-examination of the officer about

6    this note, considering the cases that talk about a relevant

7    line of inquiry being the investigation that was conducted?

8            MS. FEIGUS:  I think, Your Honor, that this was

9    problematic given the document itself.  The document was

10   simply a notation or a memorialization.  It does not indicate

11   that anybody, let alone Rakeem Harvey, made an admission that

12   he was the shooter.  And when the -- when the Court, rightly

13   so, pressed the prosecutor to look into it, it turned out that

14   the most that could be said was that Keemie Harvey's mother

15   had said that somebody else had said that Keemie had the gun.

16           The cross-examination --

17           THE COURT:  I don't know that it was the mother who

18   said that somebody else said.

19           MS. FEIGUS:  Yes, Your Honor, I believe so.

20           THE COURT:  I thought it was that --

21           MS. FEIGUS:  No.

22           THE COURT:  -- that Keemie said he had the gun.

23           MS. FEIGUS:  No, Your Honor.  I actually -- I can

24   point Your Honor to the -- I did a little -- it was that

25   Keemie -- that his mother heard that he had said.  So it was

1   yet another layer of hearsay.  That is -- and that was what

2   was troubling Judge Tomei, that it was layer upon layer.

3          THE COURT:  That's why it doesn't come into

4   evidence.  But how do you have a situation where there is a

5   note in the file which suggests that Keemie said to somebody

6   that he had the gun and it went off accidentally?  How do they

7   not pursue that?

8          Once it all came to light, they were able to pursue

9   it back to the mother, at least.  Why isn't it an appropriate

10  error -- area of cross-examination that you had this note and

11  you didn't look into it?  You just let the note sit there.

12         Ultimately, when they did look into it, they did

13  find -- they went back to the police officer.  The police

14  officers, relative to the mother, they got back that far in

15  it, and what troubles me about it is that -- it would be one

16  thing if it was just, that's where it ended.  But the

17  prosecutor's summation just goes on and on about the great

18  police work that was done here, which, you know, is, at the

19  very least, a little disingenuous when they have been told

20  that -- not allowed to cross-examine about it.

21         Are you still maintaining the position that it

22  wasn't error to exclude the note?  I mean, to exclude -- not

23  the note itself.  To exclude cross-examination about the note?

24         MS. FEIGUS:  Your Honor, I believe -- I believe it's

25  a close question, but it was a matter of discretion.

1          The Court -- the Court was of the view that by

2    cross-examining the police, the defense was sort of trying to

3    get in through the back door what they had been precluded from

4    doing in terms of -- they wanted a stipulation about that

5    document and the Court said, rightly, this is inadmissible

6    hearsay.

7          And the defendant's analogizing this --

8          THE COURT:  It was inadmissible hearsay for the

9    purpose that Harvey had the gun.  But they articulated that

10   they had another purpose, which was to show that the police

11   never investigated, that they assumed from day one that Watson

12   had the gun.  They never even confronted Harvey with the fact

13   hey, did you have the gun.  They never asked him that

14   question.  That they had this one dimensional view of the case

15   and they never went past that.  That's at least argument that

16   they can -- that a defendant can make to the jury.

17         But it is particularly exacerbated here when you

18   have the prosecutor saying, is there any evidence of any lead

19   they didn't follow.

20         MS. FEIGUS:  Your Honor, that was clearly -- should

21   have been left unsaid, clearly.

22         THE COURT:  It wasn't just that.  It was a couple of

23   other statements as well, which is troubling.

24         MS. FEIGUS:  But, Your Honor, the -- the defense was

25   able to mount the defense that it was -- that Keemie Harvey

1   was lying and that Keemie was the shooter.  They were able to

2   present their defense here.  Given this -- if you only had --

3           THE COURT:  They were able to mount that defense in

4   part because, I take it, that the State put in Watson's

5   statements.  Correct?  As evidence?

6           MS. FEIGUS:  Yes.

7           THE COURT:  In which he said Keemie had the gun.

8           MS. FEIGUS:  In which he ultimately said Keemie had

9   the gun.

10          THE COURT:  The jury was aware of the defendant's

11  position, Watson's position, that he claimed that Keemie had

12  the gun?

13          MS. FEIGUS:  Absolutely.

14          They cross-examined him in detail about his very

15  beneficial cooperation deal, et cetera.

16          But if -- if you just had the testimony of Freddy

17  Burns and the identification of Ramcess Jean-Louis, the -- the

18  evidence in this case would be weighty.  But given

19  that -- given the lie, given the false statement that the

20  defendant himself gave here, this is -- should be subject

21  to -- is subject to harmless error analysis, and assuming that

22  the decision to forbid the defense to cross-examine Detective

23  Bond and Officer Pierce about the failure to investigate

24  whether Keemie Harvey was the shooter, and the prosecutor's

25  statements in summation, any error was harmless.

1          THE COURT:  Okay.  Thank you.  Thank you very much

2     for coming in.  I appreciate it.

3          MS. FEIGUS:  Your Honor, would you like papers?  Is

4     there anything that you would like to --

5          THE COURT:  I don't think that I need any

6     further -- I think we have addressed the issues.

7          Both parties are essentially of the view that even

8     though it's equitable relief, it couldn't be remanded for

9     resentencing on a lesser offense.  Both parties agree to that.

10          MR. CARNEY:  I think that actually having heard

11     that -- the way that it was charged to the jury, it

12     doesn't -- it was first degree robbery.  But there was no

13     mention of a gun.  So I believe that it could be remanded.

14     There was no admission that there was a gun involved.  It is

15     just a forcible robbery and serious injury and two people

16     involved.

17          THE COURT:  Do you agree with that then?

18          MS. FEIGUS:  Your Honor, I would like to look into

19     it, if I may.

20          THE COURT:  All right.  Maybe you want to put in, a

21     week from today, just put in your view of that issue?

22          I take it, if the Court -- one issue would be

23     whether this -- the State would agree to that.  In other

24     words, you would have the right -- if I vacated this

25     conviction over the error, you would have the right to retry

1    him on first degree murder.  It might be relief that you

2    would -- that the State would object to.

3                MS. FEIGUS:  Right.

4                But, Your Honor, would it be possible for me to have

5    a little more time to look into this?

6                THE COURT:  Yes.

7                Two weeks?

8                MS. FEIGUS:  I have a vacation, a family vacation.

9    Is it possible to just do it in August?

10               THE COURT:  Yes.  The end of the first week in

11   August then?

12               MS. FEIGUS:  I am away then.  I just -- this may be

13   something that needs to be discussed with -- this isn't going

14   to be something that I can determine on my own.

15               THE COURT:  The end of the second week in August

16   then?

17               MS. FEIGUS:  I am away.

18               THE COURT:  You are away all of August?

19               MS. FEIGUS:  No.  I will be back at the beginning of

20   the third week.

21               THE COURT:  Do you have any objection to this?

22               MR. CARNEY:  No, no objection.

23               THE COURT:  Okay.  Tell me when you can do it,

24   Miss Feigus.

25               MS. FEIGUS:  The --

GR      OCR      CM      CRR      CSR

30

1          THE COURT:  Instead of letting me play Let's Make a
2    Deal here.
3          MS. FEIGUS:  Thank you, Your Honor.
4          THE COURT:  The 21st?
5          MS. FEIGUS:  What day is that?
6          THE COURT:  That's Friday.
7          MS. FEIGUS:  Yes, Your Honor.  That's fine.
8          THE COURT:  Okay.  If you wanted to respond to it,
9    maybe the 28th.  You can be looking into the issue at the same
10   time.
11         MR. CARNEY:  August 28th?
12         THE COURT:  Yes.
13         MS. FEIGUS:  It's whether Your Honor remands it?
14         THE COURT:  Yes.  And what the State's position is.
15   You could say that I could do it or I couldn't do it.  But if
16   you could do it, it's -- we would --
17         MS. FEIGUS:  Object?
18         THE COURT:  -- insist on our right to retry for
19   first degree murder or second degree murder.
20         MS. FEIGUS:  Okay.
21         THE COURT:  If you are capable of indicating what
22   your position would be in that context.
23         Okay?
24         MS. FEIGUS:  Thank you, Your Honor.
25         THE COURT:  Thank you.       (Matter concludes.)