UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DARRELL WATSON,                                                     06 CV 2212 (CBA)

                  Petitioner,                           NOT FOR PUBLICATION
   -against-

GARY GREENE, Superintendent,                                       MEMORANDUM
Great Meadow Correctional Facility, and                            AND ORDER

ELIOT SPITZER, New York State Attorney General

                Respondent.
-----------------------------------------------------------------X
AMON, United States District Judge:

Petitioner Darrell Watson was convicted of First Degree Murder after a jury trial in the
Supreme Court of the State of New York, Kings County, on February 28, 2000. He was
sentenced to a term of imprisonment of 25 years to life. On April 4, 2005, the Appellate
Division unanimously affirmed Watson's conviction, and the Court of Appeals denied him
permission to appeal further on June 20, 2005. Watson is currently incarcerated pursuant to the
judgment of conviction.

At trial, Watson conceded that he was one of the two individuals who committed the
armed robbery of Patrick Morris on July 11, 1998, which resulted in Morris's death. His
principal defense—which, if successful, would have exonerated him of the most serious charge
of First Degree Murder—was that the other individual, Rakeem Harvey, was the one who
actually shot Morris.

Watson has filed a petition for a writ of habeas corpus in this Court pursuant to 28 U.S.C.
§ 2254, challenging his conviction. The petition centers around a note, disclosed to the defense

while trial was underway, which stated: "Keemie Harvey, a/k/a Keemie Cooke. Keemie had gun and went off accidentally." Watson argues that: (1) the trial court denied him the right of confrontation secured by the Sixth Amendment by improperly forbidding him from using this note to cross-examine investigating detectives regarding the thoroughness of their investigation, and (2) the prosecution's delayed disclosure of the note amounted to the effective suppression of favorable evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194 (1963). For the reasons stated herein, the petition for a writ of habeas corpus is granted.

## I.  Background

The following facts are taken from the testimony at trial.

### A.  The Murder of Patrick Morris

On the evening of July 11, 1998, Patrick Morris and four of his friends from college— Ramcess Jean-Louis, Curt Phillips, Loren Hillery,[1] and Edwin Philogene—attended a barbecue in the Flatbush area of Brooklyn, New York. (Trial Tr. at 720-21, 809-10.)[2] Shortly after midnight, the five of them left the barbecue and drove to 7 South Portland Avenue, where Jean-Louis and Philogene shared an apartment and Phillips had left his car. Jean-Louis drove in one car with another friend of his, while the other four friends drove together in Hillery's car. When they arrived at South Portland Avenue, Jean-Louis and his friend found a parking spot, and Hillery's car pulled up next to a driveway near the apartment. Jean-Louis and Philogene went inside, and Phillips and Hillery decided to stop briefly in the apartment to use the bathroom

---

[1] Loren Hillery's friends were accustomed to calling him "Terry," which they refer to him throughout the Trial. (Trial Tr. at 810, 849.)

[2] Citations to "Trial Tr." refer to the transcript of the trial The People of the State of New York v. Darrell Watson which hereinafter are abbreviated "Tr."

before continuing on to their homes in the Bronx. Morris, who was sitting in the front passenger seat of Hillery's car, stayed in the car.

While they were in the apartment, Jean-Louis, Phillips and Hillery heard a "loud bang" coming from outside. Somebody shouted that it sounded like a gunshot. The three men ran out of the apartment to see what had happened, Phillips first followed by Hillery and Jean-Louis. When they arrived on the street, they saw two men they did not recognize standing by the front passenger side of Hillery's car. One was wearing a gray hooded sweatshirt. Jean-Louis ran toward the car. As he approached, one of the men turned toward him and said something to the effect of "Nothing happened. I didn't hear anything." The other man was leaning into the car with his body, and Jean-Louis overheard him say "the more you resist, the more it's gonna hurt."

Morris was not resisting. His body was completely slumped over, and the man leaning into the car was propping his body up against the seat in order to reach into his pockets. Jean-Louis took a couple of steps back and repeated: "Nothing happened. Everything's alright." He then retreated to the apartment to call the police, followed by Phillips. Not able to get into the apartment, Hillery watched from the steps as the two men fled down South Portland Avenue. By the time the police had arrived, the assailants were gone. Despite efforts to resuscitate Morris, he died from internal bleeding caused by a single gunshot wound to the abdomen. (Id. at 1006-09.)

## B.    The Investigation

### 1.    The Investigation of Darrell Watson

While police were investigating the shooting, a local man turned over a wallet that he found in the vicinity of the crime scene. (Id. at 540.) The wallet contained documents bearing Watson's name and address, along with several telephone numbers written on various pieces of

–3–

paper. (Id. at 564.) Detectives discovered that the victim's cellular phone was used to call these telephone numbers sometime after the shooting. (Id. at 1115.) Using one of the telephone numbers, Detectives contacted Watson's brother and visited the store where both brothers were employed. (Respondent's Brief to Appellate Division, 5-7.) Watson admitted to having lost his wallet and, ultimately, the detectives convinced both brothers to come to the precinct to recover the wallet. (Tr. at 651-55.) Watson arrived at the precinct around or shortly after 5:00 p.m. on July 13, 1998.

At the precinct, Watson made a series of statements about his involvement in the shooting of Patrick Morris. Initially, Watson said that he had been at a club that evening with two men, one named Fred and another named "Divine," and that after he left the club he noticed that his wallet was missing. (Id. at 692, 695-96.) He claimed that he had purchased a cellular phone, which turned out to belong to the victim, from Divine the next day for fifty dollars. (Id. at 696-97.)

Later that evening, Detective Thomas Donohue told Watson that he did not believe his story, and Watson made another statement. He substantially repeated the statement to Detective Amilcar Rodriguez, who recorded it in writing, and Watson reviewed and signed it. Watson stated that he had gone to a barbecue at around 4:30 p.m. on July 11, 1998, where he met up with his friends "Keemie" and "Jahad." They consumed beer and liquor at the barbecue and left at around 10:30 p.m. to go to a club, where they consumed more alcohol. At approximately midnight or 12:30 a.m., he left the club with Jahad and Keemie.[3] As they approached South Portland Avenue, Jahad saw a man sleeping in a car and proposed robbing him. Watson's efforts

−4−

to persuade Jahad and Keemie not to commit robbery were unavailing, and as Jahad and Keemie approached the car, Jahad produced a small hand gun from a paper bag. Watson stood on the corner while Keemie and Jahad proceeded with the robbery. Suddenly, Watson heard a "pop," and Jahad and Keemie came running around the corner and the three of them ran away. Jahad and Keemie had taken a chain, a cell phone, and a wallet with two credit cards from the victim. Watson took the phone, which he used to call a friend's house. Then he turned in for the night. (Tr. 906-907, 958-59.)

The next day, on July 14, 1998, Watson participated in a lineup that was viewed by Curt Phillips, Loren Hillery, and Ramcess Jean-Louis. Phillips positively identified Watson as having been the assailant who said: "Everything's all right." Hillery viewed the lineup and said that Watson looked like the man in the gray sweatshirt who had been involved in the robbery, but said that he was not certain. Jean-Louis made no identification but explained that he was "tied" between Watson and one of the other men standing in the lineup. Following the lineup, Watson was placed under arrest. Jahad Grant was also placed in the lineup, but none of the witnesses identified him.

That night, Detective Bond told Watson that his story was falling apart, and Watson said that he wanted to make a deal. Detective Bond said that he could not make a deal and neither would the District Attorney. Watson then made another statement. He said that he was at a party with Keemie and Jahad. He and Keemie left the party together walking down South Portland Avenue. There, they saw a man in a car. Watson and Keemie robbed the man in the car, and Keemie shot him. Then, a man approached asking "what's going on?" and Watson replied

---

[3] There was no mention of Fred or Divine in this version of the events.

"nothing is happening." In this statement, only Watson and Keemie were involved in the robbery, not Jahad. Watson repeated this story in a videotaped statement made to an Assistant District Attorney later that evening. Watson claimed that he did not know Keemie had a gun or that he was going to shoot the victim.

### 2. The Investigation of Rakeem Harvey

Keemie was nowhere to be found. After Watson told detectives about Keemie, whose full name was Rakeem Harvey, detectives set about trying to locate him during the evening of July 13, 1998. Detectives went to his home and place of work the next day, but could not find him in either location. (Tr. 1146-47.) Successive trips to Harvey's workplace, surveillance of his home, and a canvass of the neighborhood were also unsuccessful. (Id. at 1148.) Detectives circulated a wanted poster for Rakeem Harvey to all of the precincts in the Brooklyn North Homicide Squad. (Id. at 1150-51.) They learned later that Rakeem Harvey had fled from New York to Georgia, where he was living under an alias.

Sometime in July 1998, Officer Sherry Pierce, who was not involved in the investigation of Patrick Morris's murder, reported to investigating detectives that she had heard some information regarding Rakeem Harvey. Some people in Officer Pierce's family knew Harvey and his family, and she had overheard information that Rakeem Harvey had a gun on the night of Morris's murder and that it went off accidentally. (Tr. 1090.) This information was transcribed into what the parties refer to as the "Harvey Memo" or the "Harvey Note," and placed into the detectives' case file in July 1998.

Rakeem Harvey was not found until July 27, 1999, more than one year after the shooting. (Tr. 1145.) On July 16, 1999, detectives received anonymous information that Harvey had been

arrested in Georgia. (Id. at 1152.) Detective Bond contacted the Georgia authorities, from whom he learned that Harvey had been arrested for driving while intoxicated on July 15, 1999, and that he was living under the assumed name Otis Lamont Hood. (Id. at 1157.) Detective Bond and his colleague, Detective Parker, flew to Georgia where they met with Harvey at his place of employment. (Id. at 1158-62.) There, Harvey made a series of statements, including: "What took you so long? I knew you were coming when I got arrested last week. I told my boss you were coming. My family told me to run, but I was too tired." (Id. at 1164.) Detectives Bond and Parker took Harvey back to New York, where he pled guilty to First Degree Robbery and later testified against Watson at trial in return for a sentence of 8 to 16 years in prison. (Id. at 1172.)

### C.  Defense's Requests for <u>Brady</u> Material

Watson was indicted on 10 counts, including Murder in the First Degree.[4] During the months leading up to trial, defense counsel filed three separate requests for the disclosure of favorable evidence pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). The first request, filed on October 9, 1998, specifically asked for "the names of any witnesses, confidential or not, who identified or named a person(s) other than Darrell Watson as the perpetrator of the crimes charged," and for "any facts or information that Darrell Watson did not commit the homicidal act" or that he "was not armed with a deadly weapon." (Pet'r Br. at 3-4.)

On June 21, 1999, defense counsel requested police reports and notes regarding the police

---

[4] The indictment charged Watson with Murder in the First Degree (N.Y. Penal Law §125.27[1][a][vii]), Murder in the Second Degree (N.Y. Penal Law §125.25 [1], [2], [3]) (three counts), Robbery in the First Degree (N.Y. Penal Law §160.15[1], [2]) (two counts), Robbery in the Second Degree (N.Y. Penal Law §160.10 [1]), Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law §265.03), Criminal Possession of a Weapon in the Third Degree (N.Y. Penal Law §265.03[4]), and Criminal Possession of Stolen Property in the Fifth Degree

investigation of Rakeem Harvey and, in particular, all material relating to the police effort to locate Harvey and to investigate his role in the shooting. (Id. at 4.) In a letter dated September 7, 1999, the defense once again asked for Brady material, including "any evidence that any person who was a witness to the alleged crimes indicated that Mr. Watson was not the person who actually shot Patrick Morris" and any evidence "that someone other than Mr. Watson was the person who actually shot Patrick Morris." (Id.) By the time trial began, the prosecution still had not turned over the Harvey Note.

## D.    Trial Proceedings Concerning the Harvey Note

### 1.    Disclosure of the Note

On February 14, 2000, the day that Watson's trial was scheduled to begin, the prosecutor informed the court that he was not ready. He asked for "some additional time to prepare some discovery and to become a little more familiar with what's involved in this case," stating that he had not yet been able to comply with discovery requests made by defense counsel during the prior weekend. (Trial Tr. at 4-5.) Recognizing that "the obligation is on the People to turn over discovery," the prosecutor stated that he was "not in a position to give them everything that they need and to be comfortable that I've done that." (Id. at 7-8.) The trial was adjourned to the following day. (Id. at 10.)

On February 15, 2000, defense counsel advised the court that a substantial amount of discovery material still had not been turned over. (Id. at 13.) In particular, the defense stated that the file regarding Rakeem Harvey had not been disclosed and asked the Court to direct the prosecution to turn it over. (Id. at 13-14.) The prosecution reported that "late last night" it had

(N.Y. Penal Law §165.40).

found pertinent records relating to Rakeem Harvey and that it would be in a position to turn everything over the following day. (Id. at 14-15.) The defense stated that it was prepared to go forward with voir dire, but would need to review the discovery material before opening statements. (Id. at 15.) The court began jury selection.

On the second day of jury selection, February 16, 2000, the defense informed the court that, during lunch, it had found a copy of a hand-written note among the discovery materials produced by the prosecution.[5] (Trial Tr. at 460.) The note was not completely legible, but seemed to say: "Keemie Harvey, a/k/a Keemie Cooke. Keemie had gun and went off accidentally." (Id. at 460.) Defense counsel demanded to know who had generated the note and who the source of the information was. (Id. at 460-61.) The following conversation ensued between the Assistant District Attorney Benson, defense counsel Segal, and the court:

> MR. BENSON: Yeah. That -- actually, this is the closest reading I've had of that, and that's the best that it looks. My understanding of looking through that paper was that that's associated with looking for Keemie later on, and there's all sorts of paperwork that talk [sic] about other things Keemie may have done. And I think that's -- that's somebody that when they were looking for Rakeem Harvey gave them some information. But I don't -- I can't provide anything specific right now. I can do that after -- if I can look at -- get the original and see. I think I only obliterated addresses, that's all.
>
> MS. SEGAL: Judge, we need to know who wrote this. This is potentially exculpatory.
>
> THE COURT: Do you know who wrote it?
>
> MR. BENSON: I don't know. I can investigate that, but I can't tell you offhand. If -- that was in the mass of papers that I had, and I can't tell you what detective did it. I -- I feel like it might have been Detective Donahue because he might have

---

[5] The defense later noted that it had received the note within a stack of <u>Rosario</u> material that "was probably two to three inches thick." (Trial Tr. at 603.)

been involved in looking for Rakeem Harvey, but I'm not exactly sure. So I can set about that when we leave today.

(Id. at 461-62.) The prosecution agreed to endeavor to find a better copy of the note, pointing out that Harvey himself would not be testifying for some time. (Id. at 462.) Defense counsel replied that she wished to use the information to cross-examine the officer who had written it down. (Id.)

## 2. The Search for Information Regarding the Harvey Note

Six days later, on February 22, 2000, the prosecution still had not turned over the original note, or any fully legible, unredacted copy, or provided any information as to its source. Trial had already started and the People had presented the testimony of 18 witnesses. Defense counsel raised the issue of the Harvey Note again to the court, stating:

> This document, in our opinion, is extraordinarily important for this case. Our defense is that Keemie Harvey did have the gun; whether or not it went off accidentally, that's not something we've concerned ourselves with. But our point is that we have said that Keemie had the gun.
>
> If somebody heard from Keemie, if somebody heard during the investigation that this was in fact what happened, we're entitled to know that.

(Id. at 603-04.) Defense counsel asked that the People be ordered to find and produce a better, unredacted copy of the note, and to indicate where it was from and who wrote it, stating: "We need to have a -- we need some kind of remedy here. This is too important. We need to be able to use this piece of paper for cross examination. We need to be able to put forward this theory." (Id. at 604-05.)

The prosecution recognized "the importance of [the document] on its face to the defense" and acknowledged that "the source [of the information] might be somebody that's helpful to

them on their case," but argued that any remedy was "premature." (Id. at 605.) The prosecution had been asking each officer about the note as they arrived in court to testify, and so far nobody had claimed ownership over it. (Id. at 605-06.) The defense argued that all relevant officers, including those not on the witness list, should be contacted immediately. (Id. at 607.)

The note appeared to say: "Information comes from Perry." (Id. at 607-08.) Nobody knew who "Perry" was, however, and redactions in the disclosed copy blocked out some other writing. (Id. at 608.) The prosecution stated:

> I'm not saying that I'm going to discontinue looking, but, in terms of defense counsel demands today that I locate every officer who was involved in this case, even by their opening statement, they indicated there are many. There could be thirty or forty detectives who played some role in responding to this case in conducting canvasses or witness interviews from the different precincts.
> And I think I'm going about this as reasonably as can be expected. It's easy for one party to say, "Right now I want numerous --" if it's twenty or thirty or a couple of dozen detectives contacted today and shown that document, then there's not a basis for that, it's not reasonable, and I'm not in any position to do that. Even if I attempt it, I couldn't be successful. But we're trying to find the source of that. And I'll work on that further tonight when we're finished with the court proceedings today.

(Id. at 609.) The prosecutor acknowledged having made the redactions on the note, but claimed not to know where the original was. (Id. at 610-11.) The court ordered the prosecution to go through all of the case materials to find the original note by the end of the day. (Id. at 613)

Two days later, on February 24, 2000, the prosecution advised the court that it had identified Officer Sherry Pierce as the source of the information in the note. (Id. at 1072.) Officer Pierce's family knew Rakeem Harvey and, upon seeing wanted posters put out for Harvey's arrest, she contacted the detective squad to convey information she had heard. (Id. at 1073.) Other information on the note included the names of contacts in Officer Pierce's family

and Harvey's family. (Id.) Regarding the information about the gun, Officer Pierce did not

remember who had said it. The prosecution reported:

> To me, she said it was like vague information. And this isn't even the only thing
> that was stated. This is apparently what the detectives wrote down as being
> significant, but she can't specify in her mind this part of Rakeem Harvey's
> involvement. She indicated essentially that she heard he was involved.
> Somebody might have said he had the gun, but she can't specify who.

(Id. at 1074-75.) The prosecution further advised the court that it had brought Officer Pierce in

and made her available to defense counsel. (Id. at 1075.)

In spite of having identified Officer Pierce as the source of the information in the note,

the parties still did not know who wrote it. (Id. at 1077.) Officer Pierce advised defense counsel

that she had spoken to two people, Detectives Bond and Antoine in the 88th precinct. (Id. at

1077-78.) Detective Bond, however, had told the prosecution that he was not the note's author.

(Id. at 1077.) Although the prosecutor had spoken to Detective Antoine about the note, he had

not faxed it for him to look at. (Id. at 1078.) Defense counsel asked that the prosecution be

ordered to fax the note to detective Antoine and get an answer right away. (Id. at 1080.) The

prosecutor asserted that he had "pursued this pretty aggressively" and argued that he should be

required to fax the note "[o]nly if he's not available." (Id.) The court ordered the prosecution to

fax the note to Detective Antoine for his review that day. (Id. at 1080-81.)

### 3.    Discussion of the Note's Significance

On February 28, 2000, defense counsel informed the court that Detective Antoine had

denied having written the note. (Id. at 1088.) The prosecution had "personally checked" with ten

detectives and nobody had taken responsibility for it, even when the commander of the 88th

Detective Squad circulated the note around the squad to see if anybody could recognize the

handwriting. (Id. at 1088-89.) The defense repeated its demand to "know who wrote this." (Id. at 1088.)

The court asked defense counsel to explain what Officer Pierce had said regarding the note. According to the defense, Pierce was not forthcoming with information, but said that "there are people in her family that know Mr. Rakeem Harvey a/k/a Rakeem Cook" or know his family, and "[s]he was in the room and she overheard a number of conversations." The conversations ranged from "Rakeem Harvey did this, that he didn't do it, to him having the gun and didn't have the gun." (Id. at 1090.) Officer Pierce also stated that the only detectives she spoke to were Antoine and Bond. (Id. at 1091.)

At this point, however, both Antoine and Bond had disclaimed writing the note, and no other detective had taken responsibility for it. The court asked the defense what remedy it was seeking, assuming no further information could be found regarding the note's author. (Id. at 1091-92.) The court wanted to know what evidentiary value the note had, given that the statement in the note was, in the court's view, "at a minimum, hearsay but double hearsay, and it maybe triple hearsay." (Id. at 1092-93.) The defense initially struggled to articulate the note's relevance and grounds for admissibility, in large part because it could not attribute the statement in the note back to Harvey himself. (Id. at 1093-95.) On defense counsel's request, the court stated that it would allow the defense to question Harvey as to whether he had told neighbors or family members that he had a gun and it went off accidentally, but was not inclined to allow questioning of Officer Pierce as to what she heard. (Id. at 1095-97.) Addressing the issue of whether Detective Bond had taken any notes during his conversations with Officer Pierce, the court decided to call Detective Bond in to testify outside the presence of the jury. (Id. at 1097.)

### 4. Detective Bond Testifies Outside the Presence of the Jury

Both the prosecution and the defense were permitted to question Detective Bond outside the presence of the jury. On direct examination, Detective Bond testified that he did not prepare the Harvey Note and did not know which detective received the telephone call that was the source of the information. (Id. at 1099.) He was aware that somebody at the precinct took the call and wrote the information down, which he understood related to efforts to locate Harvey during the investigation. (Id.) Officer Bond subsequently spoke to "Sherry" and discussed the information with her regarding where Harvey could be located. (Id. at 1100.) He did not take any notes during these discussions. (Id.)

On cross-examination, Detective Bond provided more information regarding the circumstances surrounding his receipt of the note. He testified that he did not recall precisely when he first saw the note, but it was definitely within three months after Watson was arrested. (Id. at 1101.) Somebody at the precinct, the identity of whom he could not recall, handed the note to Detective Bond, and he looked it over and called the telephone number listed on it. (Id. at 1102.) When he spoke to Officer Pierce, Detective Bond asked her about the two lines stating that Harvey had a gun and it went off accidentally, but Bond did not take notes of the conversation. (Id. at 1103.) Detective Bond described the conversation as follows, explaining that information pointing to Harvey having the gun was "not of any importance" to him:

> A: Yes, I spoke with Sherry Pierce.
>
> Q: And you asked her about those two lines?
>
> A: Yes.
>
> Q: Did you take any notes of your conversation with her?

A:    No, I did not.

Q:    Did you take any notes of -- did you follow up on your conversation with her?

A:    Basically, the information she gave me was information that was already basically known that Keemie was involved.  So, at that point, it was not of any importance.

Q:    What about the note that Keemie had a gun that went off accidentally?

A:    As I stated, that was not of any importance to me, because the defendant, Darrell Watson, had already said that Keemie had the gun.

(Id.) Upon further cross-examination, Detective Bond confirmed that Officer Pierce had said that she heard Harvey had the gun:

Q:    But you specifically asked her about that second line:  Keemie had the gun, and it went off accidentally?

A:    Yes.

Q:    And she said that she had said that?

A:    Yes, she did.

Q:    And she didn't give you -- withdrawn.  She didn't say that she had heard anything else other than that, did she?

A:    No, she did not.

Q:    She didn't say she had ever heard that Keemie didn't have the gun?

A:    Not that I recall, no.

Q:    Or that Keemie wasn't involved?

A:    As I stated, I only know from what she stated, which is on this paper.

Q:    The information that she called for was, she heard that Keemie had a gun, and that the gun went off accidentally?

A:    Yes.

Q:    Did she say where she heard that information from?

A:    No, she did not.

(Id. at 1104-05.) Detective Bond further testified that he "spoke to quite a few individuals, trying to figure out where did it come from, and I did not -- I was not able to find out exactly who took the message." (Id. at 1105.) The defense summarized Detective Bond's testimony as follows:

Q:    But when you spoke to Sherry Pierce, she confirmed all the information on here, including the fact that she heard that Rakeem Harvey had a gun and that the gun went off accidentally?

A:    Yes, she did.

(Id. at 1106.) Finally, the defense explored whether Detective Bond or anyone else had ever confronted Harvey about this information after he had been located:

Q:    . . . There came a time when you spoke so [sic] Rakeem Harvey, right?

A:    Yes.

Q:    Did you ask him about what the information on this note was?

A:    No, I did not.

Q:    You never said to him:  We heard from a person, an officer, or overheard members of your family talk about this, or overheard somebody say that you said this - - withdrawn.

      You never confronted him with the information you received that he had a gun that went off accidentally?

A:    No, I did not.

Q:    To your knowledge, did anybody?

A:    No, they did not.

(Id. at 1106-07.) At this point, Detective Bond was excused from the courtroom and the parties proceeded to discuss the implications of his testimony.

Defense counsel argued that Detective Bond's testimony showed that Pierce "said something completely different to the detective" than what she said to defense lawyers during their discussions. Specifically, the defense asserted that "[i]t seems fairly certain that the only information she gave him was that Keemie Harvey had the gun, and the gun went off accidentally, not the various conversations she reported to us." (Id. at 1108.)

### 5. The Court Rules on Permissible Uses of the Note

Following Detective Bond's testimony outside the presence of the jury, the court issued a three-part ruling on the note and the information contained in it. First, Detective Bond could not be cross-examined about the note in the jury's presence because he testified that he did not write it. Second, Officer Pierce would not be permitted to testify before the jury as to what she heard on the grounds that such testimony would be hearsay. Finally, the court would permit defense counsel to question Harvey about whether he told anyone he had the gun. (Id. at 1108-09.)

Defense counsel objected to this ruling, arguing that the defense should be permitted to establish before the jury that Detective Bond insufficiently pursued information in his possession that Harvey was the person with the gun:

> MS SEGAL:     And Judge, I would just like to object on the record. At this point, we do think we should be able to go into this with Detective Bond, because he's going to testify as to what he did pursuant to his investigation in this matter. . . . Certainly we should be able to say, you had this information. You confirmed this information, and you chose not to question him about it. That goes with our theory that the people have not sufficiently investigated Rakeem Harvey as the person with the gun. . . .
>
> THE COURT:     The application is denied. Let's go. Bring in the jury. Bring in the witness.

(Id. at 1109-10.)

### 6. Detective Bond's Testimony

In front of the jury, Detective Bond testified regarding his investigation of Darrell Watson. Bond was the lead investigator from Brooklyn North Homicide. (Tr. 1112.) In that capacity, he worked with Detective Rodriguez, who was the lead investigator from the 88th Precinct. (Id.) Bond recounted his investigation of the death of Patrick Morris, including his conversations with Watson; the recovery of Morris's cell phone at Watson's place of business; his questioning and subsequent release of suspects Jason Williams (a.k.a. "Divine"), Fred Adger, and Jahad Grant; and Watson's various statements to police and to Assistant District Attorney Meg Reiss. (Id. at 1113-22.) Bond also described his efforts to locate Rakeem Harvey following Watson's arrest on July 14, 1998, and Harvey's eventual arrest in Georgia in July 1999. (Id. at 1123-24.)

On cross-examination, defense counsel elicited from Bond that, despite Watson's inconsistent statements to police, Watson was consistent in stating that he had been drinking for several hours on the date of the incident. (Id. at 1134-38.) Bond also provided more detail regarding his investigation of Rakeem Harvey, including the lengths he went through to locate Harvey and statements Harvey made to Bond upon his capture in Georgia. (Id. at 1138-66.) Of note, Bond testified that the information that Harvey had been arrested in Georgia "came through anonymous information," which Bond heard from people on the streets. (Id. at 1152-53.) Bond clarified that these anonymous informants were not members of Harvey's family. (Id.)

Detective Bond testified that he spent approximately "a day and a half" with Rakeem Harvey in Georgia but never asked him whether he had shot Patrick Morris or informed him that Watson had accused him of having the gun. (Id. at 1166-67.) In fact, to Detective Bond's knowledge, neither he nor Detective Parker ever asked Harvey if he shot Morris. (Id. at 1167.)

−18−

Bond did confront Harvey about whether his statements were accurate, telling him, "based on the story here that you had given me, you had more involvement in this than you are saying." (Id. at 1179.) On recross, the court prevented defense counsel from asking Bond about the information he received from Officer Pierce:

Q:      You learned that somebody named Sherry --

MR. BENSON:      Objection.

THE COURT:      Sustained.

Q:      Told --

THE COURT:      Sustained.  Don't go into it.

(Id. at 1180-81.)

### 7.      Further Information About the Note Revealed

After Detective Bond completed his testimony, the People informed the court that it had received additional information regarding the sources of the information contained in the Harvey Note. (Tr. 1225.) According to the People, after Officer Pierce spoke with defense counsel, she contacted some of her family members to determine who had provided her with information about Rakeem Harvey. (Id.) An investigator for the People soon thereafter received a call from Officer Pierce's sister, Sonja Pierce, who said that she had received information about Harvey's role in the crime from Harvey's mother. (Id.) According to Sonja Pierce, Harvey's mother had told her that she heard Harvey had the gun. (Id.)

The prosecutor reported that he had asked Harvey about that information during the previous week, and that Harvey denied every making such a representation to his mother. (Id. at 1226.) When contacted, Harvey's mother also claimed that she never made any such

representation to Sonja Pierce. (Id.) The People took the position that this new information provided a further good faith basis for the defense to cross-examine Harvey himself about the information, but argued that if Harvey denied making those statements the only person the defense should be allowed to question about them was Harvey's mother. (Id. at 1227.)

The defense argued that questioning Harvey or his mother was insufficient because there were "no two people that have a greater self-interest in . . . maintaining Rakeem Harvey's story that Darrell Watson is in fact the person who shot the gun." (Tr. 1227.) Defense counsel anticipated that Harvey would simply deny having ever told his family or friends that information, and there would be no way for the defense to contradict him. (Id. at 1229.) The defense urged that "[s]omehow it needs to get to the jury that we're just not bringing this out of thin air; it's not something that comes from Darrell Watson in his own interest; this is something that came from other witnesses." (Id. at 1230.)

The defense argued that the new information supported Watson's "right to confront Detective Bond with this information and to allow us to go into what information Detective Bond had at the time that he questioned Rakeem Harvey." (Tr. 1228.) The court denied the defense's application, stating that the new information reinforced its earlier decision that the information constituted multiple levels of hearsay. (Id. at 1231.) The court noted that the People intended to call Harvey as a witness, so that defense counsel would have an opportunity to cross-examine him regarding the statement. With regard to questioning Detective Bond, the court did not "see what the probative value is in questioning the detective regarding that statement." (Id. at 1232.) Over defense counsel's objection that the information would be used with Detective Bond for a different purpose (i.e. for the detective's knowledge), the court stated: "I know, and I believe

that purpose was not probative. Not only not probative, I don't even believe it could come in any way." (Id. at 1232-33.)

### E. Eyewitness Testimony at Trial

At trial, in addition to Detective Bond, other involved police officers testified regarding their investigation of Watson, their pursuit of Rakeem Harvey, and Watson's inconsistent statements to the police. The prosecution also presented the eyewitness testimony of several witnesses. The Court summarizes that testimony here to provide context necessary to evaluate Watson's Brady and Confrontation Clause claims.

#### 1. William Dumke

The People's first eyewitness was William Dumke, a bystander who observed the shooting. Dumke testified that, shortly after midnight, he was sitting on the front porch of his sister's house at 16 South Portland Avenue smoking a cigarette when he heard "a loud bang or pop." (Trial Tr. at 578-79.) When he looked in the direction of the noise, he saw two men who appeared to be trying to pry open a car door. (Id. at 579.) They appeared to be "struggling with something," as if "they were trying to get into the car." (Id. at 581-82.) Then, a man in a "white T-shirt came out followed by two of his friends who were hanging back about 10 feet. He approached the two guys at the car and he said to them, 'Is there a problem?'" (Id. at 584.) One of the men responded, but Dumke could not hear what he said. The man with the white T-shirt and the two men who were with him then turned around and started walking, and then running, back toward the house. (Id. at 585.) The two men at the car "continued doing what they were doing for about a minute to thirty seconds" before walking off down South Portland Avenue. (Id. at 586.) One of the men at the car was wearing a gray hooded sweatshirt with the hood up and

the other was wearing a white shirt with a black design on it. (Id. at 591.) Dumke was not able to see if either man was holding anything in his hands. (Id. at 592.)

### 2. Ramcess Jean-Louis

Ramcess Jean-Louis testified that he was inside his apartment at 7 South Portland Avenue with his friends Edwin Philogene, Curt Phillips and Loren Hillery shortly after midnight on July 11, 1998, when suddenly he heard a shot. (Id. at 720-24.) Patrick Morris had stayed by himself in Hillery's car. (Id. at 723-24.) Upon hearing the shot, Jean-Louis ran outside and saw two men he did not recognize standing by the front passenger side of the vehicle. (Id. at 725, 730.) The man who was standing closest to the rear passenger seat had his body "completely emerged into the vehicle," while the other was "standing upright, along the vehicle." (Id. at 726, 730.) Both of them were touching the vehicle with their bodies. (Id. at 726, 730.) The man who was leaning into the vehicle had his body completely inside of it down past his waist and was rummaging through Morris's pockets. (Id. at 731.) Jean-Louis approached the car until he was about four to five feet behind the two men. (Id. at 732.) As he approached, running, the man who was standing upright outside the vehicle turned and gestured to Jean-Louis with his left hand, saying words to the effect of "I didn't hear anything. Nothing happened." (Id. at 726, 732.) Jean-Louis heard the man who was in the vehicle, rummaging through Morris's pockets, say "The more you resist, the more it's gonna hurt." (Id. at 732.) At that point, Jean-Louis was able to see inside the car and saw that Morris was not resisting at all. (Id.) His body was "completely leaning over . . . to the point where the guy who was rummaging through his pockets had to pick his body back up and put it up against the seat while he was saying, 'The more you resist, the more it's gonna hurt.'" (Id. at 732-33.)

Jean-Louis was closer to the scene than his two friends, who were about two cars down, and he could see that the man who was standing up outside the car had a silver revolver in his hand. (Id. at 733.) He was holding it in a relaxed fashion, pointing it toward Patrick. (Id.) The man who was standing up outside the car suddenly became tense and said, "Nothing happened." (Id. at 734-35.) Jean-Louis took a couple of steps back and repeated, "Nothing happened. Everything's all right." (Id. at 735) He took about two steps and then ran into the apartment to call 911. (Id.) By the time he got back outside, the two men were gone. (Id. at 740.)

In the hours following the shooting, Jean-Louis spoke to several police officers and provided a more detailed description of the two assailants. (Id. at 745.) The two men were both African American. (Id. at 746.) The man who was standing outside the vehicle the whole time was light skinned, wearing a gray hooded sweatshirt and glasses. (Id.) The other man had darker skin and no glasses. (Id.) The light-skinned man had a gun in his hand. (Id. at 747.)

At the police precinct, Jean-Louis viewed two lineups. (Id. at 748.) In the first lineup, he was unable to make a positive identification of anybody, but he thought he recognized either Number 3 (Watson) or Number 4. (Id.) In the second lineup, Jean-Louis did not recognize anyone. (Id.)

On cross-examination, the defense questioned Jean-Louis about a sworn statement he made to the police at the precinct in the early morning hours following the shooting. In this statement, Jean-Louis described the man leaning into the car as having been wearing a gray sweatshirt:

> Q:    Now before you started making your dash towards the apartment, the
>       person that was leaning in the car and wrestling with Patrick, had he ever
>       removed himself during this whole period?

A:      No, I don't think that he did.

Q:      Okay.  And what was he wearing, if anything?

A:      I remember one of them was wearing a gray sweat shirt.  I think it was
        him.

Q:      The one leaning in the car?

A:      Leaning in the car.

(Id. at 775-76.)  Defense counsel proceeded to establish that, in three statements made prior to

Jean-Louis's first testimony before the grand jury, Jean-Louis did not describe the person with

the gun as having been the one wearing a gray sweatshirt.  (Id. at 792-94.)  In giving those

statements, Jean-Louis testified that he "misspoke, and . . . was confused about that issue, for that

statement."  (Id. at 793.)  Jean-Louis had been consistent, however, in identifying the light

skinned man with glasses as having the gun.  (Id. at 800-03.)

### 3.      Curt Phillips

Curt Phillips testified that he was on his way out of the apartment at 7 South Portland

Avenue when he "heard a loud bang coming from outside."  (Id. at 812.)  He ran out the door,

and when he got outside he "saw two men, half of their upper body's [*sic*] in the front passenger

window, and they were saying something."  (Id.)  He could not hear what they were saying, but

they were "murmuring and just jostling around a little bit."  (Id.)  Jean-Louis passed him by and

went right up behind where the two men were standing by the car, Phillips heard him ask, "is

there a problem?  Is there something going on here?  Is there anything wrong?"  (Id. at 812-13.)

Then, the man "who was in the car, closest to the back of the car where I was looking at down

the sidewalk, he pulled his body out and he turned and he told [Jean-Louis], 'no, there's no

–24–

problem here. There's nothing going on.'"[6] (Id. at 813.) Then the man "put his head back down and he looked like he continued doing whatever he was doing." (Id.) Jean-Louis started coming back saying, "just call 911" and ran inside, with Hillary running after him. (Id.) Phillips went after them but the door had locked, so he went back up to the sidewalk, from which he saw the two men turn and then take off down South Portland Avenue toward DeKalb. (Id. at 814.)

Phillips also described the two individuals he saw by the car. The man who turned and said something to Jean-Louis was light skinned, wearing a pair of glasses and a gray sweatshirt with a hood. (Id. at 824.) The other man had darker skin and was wearing darker clothing. (Id.) Phillips did not hear the dark skinned man say anything. (Id.) He did not see whether either man was carrying a weapon. (Id. at 825.)

Two days after the incident, Phillips went to the police precinct to view two lineups. In the first lineup, he positively identified Number 3 (Watson) as the man who was wearing the glasses and the gray sweatshirt, who turned and made a comment to Jean-Louis. (Id. at 826.) Phillips also made an in-court identification of Watson during his testimony. (Id. at 827-28.)

### 4. Loren Hillery

Loren Hillery testified that he was inside 7 South Portland Avenue, having just used the restroom, when he heard what he "initially thought was a firecracker." (Id. at 854.) When he ran outside, he saw men standing by the front passenger door, leaning into the car. (Id. at 855, 857,

---

[6] The Court notes that this testimony is inconsistent in certain respects with Jean-Louis's testimony. Jean-Louis testified that only one man had his body inside the vehicle when he approached, and that was the man closest to the rear passenger seat. (Trial Tr. at 726, 730.) Jean-Louis also testified that it was the other man (i.e. the one closest to the *front* of the vehicle) who told him that "Nothing happened." (Id. at 726, 732.) Phillips testified that it was the man closest to the back of the vehicle who turned and spoke to Jean-Louis. (Id. at 813.)

876-77.) Jean-Louis approached them to ask what was going on and one of the men said, "nothing. I didn't hear anything." (Id. at 855.) Then, Jean-Louis ran back towards the house, screaming to call 911, and Hillery followed him into the house. (Id. at 858.) Hillery testified that the man who spoke to Jean-Louis had light skin and was wearing glasses and a gray hooded sweatshirt. (Id. at 861-62.) The man who was inside the car had darker skin. (Id. at 862.) Hillery did not see if either man had a gun. (Id. at 862-63, 880.)

Hillery later identified Watson in a lineup as having been the man with lighter skin, wearing a gray sweatshirt and glasses. (Id. at 864-65.) He also identified Watson in court. (Id. at 866.) On cross-examination, defense counsel impeached Hillery with an audio-taped statement he had made to police approximately eight hours after the incident. In the statement, Hillery stated that he did not know which individual was wearing gray and which was wearing white. (Id. at 881.)

### 5. Fred Burns

The State offered the testimony of Frederick Burns, who had known Darrell Watson from the neighborhood for approximately fifteen years. (Id. at 1190-91.) Burns testified in exchange for a sentence of 60 days for his 1999 arrest for third-degree criminal sale of heroin on school property. (Id. at 1195-96, 1205.) He had previously served three years in jail in connection with two felony convictions. (Id. at 1197, 1207.)

Burns testified that he held a party at his home at 160 South Portland Avenue on the night of July 11, 1998. (Id. at 1191.) Watson, Harvey, and Jahad Grant attended the party. (Id. at 1193-94.) Burns had often seen Watson "high" on alcohol, marijuana, and angel dust, but that night Watson seemed "more than usually high." (Id. at 1199-201.) According to Burns, Watson

said to him, "Son, we gonna be all right," and lifted up his shirt to reveal a gun in his waistband. (Id. at 1192-93.) Burns replied that this was not "that type of party," and went upstairs to get Watson some food. (Id. at 1194.) When he came back downstairs, Watson was gone. (Id.) Burns did not see Harvey or Grant with a gun that night. (Id.)

### 6. Rakeem Harvey

Rakeem Harvey testified in return for a promised sentence of eight to 16 years for robbery in the first degree. (Id. at 1274.) Harvey testified that he was with Watson and others earlier in the day on July 11, 1998. (Id. at 1275.) Watson was drinking beers and smoking marijuana, "getting pretty high." (Id.; see also id. at 1307-12.) That night, they went to Frederick Burns's party. (Id. at 1275.) On the way, Harvey saw Watson playing with a silver handgun. (Id. at 1276.) Watson was "acting up" at the party and Burns asked him to leave. (Id. at 1275-76.) When they left the party, Harvey entered a store to buy cigarettes and beer and, when he returned outside, Watson was walking toward the corner of DeKalb and South Portland. (Id. at 1276-77.)

Harvey followed Watson to South Portland and saw him stop to speak to somebody in a car. (Id. at 1277.) When Harvey arrived at the car, he leaned in and saw that Watson was pointing a gun at the man's head. (Id.) Watson was standing toward the front of the car, while Harvey stood closer to the rear. (Id. at 1323.) Watson told Harvey to take the man's bracelet off and Harvey tried to do so, but the man snatched it away. (Id. at 1278.) Then, Watson lowered his gun and shot him. (Id.) Harvey "stood up to get out of there," but there were "about five people in back of me, and they were standing right there. So I stuffed my face back in the car to shade it." (Id.) Finally, Harvey and Watson walked away down the street and, when they got to the corner, Watson "took off running." (Id. at 1279-80.) Watson had taken the man's cellular

–27–

phone and a chain. (Id. at 1279.) In total, Watson and Harvey were at the car a "[a] little less than a minute." (Id.)

Later that night, Watson called Harvey to ask if he had heard of any police involvement in the incident, and Harvey said no. (Id. at 1280.) Harvey asked Watson why he shot the man in the car, and Watson said that it was "because the guy shouldn't have resisted." (Id.) Watson told Harvey that he disposed of the gun in a sewer on Adelphi Avenue. (Id. at 1281.) A few days later, Homicide detectives arrived to question Harvey's brother, Fred Adger. (Id. at 1282-83.) Harvey's family advised him to leave the state. (Id. at 1284.) Following their advice, Harvey fled to Atlanta, Georgia, where he lived under the name Otis Hood until he was arrested there for drunk driving and extradited to New York. (Id. at 1284-87.) When he met Detective Bond following his arrest in Georgia, Detective Bond told Harvey that "he kn[e]w that I didn't kill the guy" and told him that he should "do the best thing" by admitting what he did. (Id. at 1324.)

On cross-examination, Harvey denied having told someone in his family that he had the gun and it went off accidentally. The testimony proceeded as follows:

Q:    Do you know a family named Pierce?

A:    No.

Q:    Your family was of assistance to you in keeping you hidden; isn't that right?

A:    Yes.

Q:    And one of the reasons your family was of assistance to you is because you told your family at some point that you had the gun, and that the gun went off accidentally; is that right?

A:    No

Q:    And when they heard that, they were afraid for your safety, and they told

–28–

you to get out of town, right?

Q:    ~~A:~~ No.


A:    No.

Q:    That's not right?

A:    No.

(<u>Id.</u> at 1291.) Later in the questioning, defense counsel tried again:

Q:    And the reason that your family wanted you to run away was because you told somebody in your family that you had a gun, and that the gun went off accidentally, and your family thought, well, we have got to get him out of here, we have got to hide him; isn't that what happened?

A:    No.

(<u>Id.</u> at 1316.)

### 7.    Jeffrey Stephens-Prince

As its final eyewitness, the People offered the testimony of Jeffrey Stephens-Prince, a bystander to the incident. Stephens-Prince testified that he was walking down South Portland Avenue towards DeKalb when he saw "some gentlemen leaning on a car, talking to someone in the passenger side of the car." (<u>Id.</u> at 1337.) One person was leaning on the car and the other was standing behind him. (<u>Id.</u> at 1339.) The person leaning on the car was talking with the person in the passenger seat, saying "give it up. Give it up." (<u>Id.</u>) The other man was standing at the front of the car. (<u>Id.</u>) As Stephens-Prince passed the car, he heard something that sounded like a "fire cracker pop or a popping sound" and "something like a gasp of air." (<u>Id.</u> at 1340.) After the noise, the man leaning on the passenger side of the car was "still engaged in conversation" with the person inside the car. (<u>Id.</u>) According to Stephen-Prince, the person leaning on the car who said "give it up, give it up" was "light in complexion" and wearing dark glasses and a hooded sweatshirt, jacket, or shirt that was either gray or white. (<u>Id.</u> at 1341-42.)

The person standing toward the front of the car had dark skin. (Id. at 1342.) Stephens-Prince did not see either person with a gun. (Id.) On cross-examination, the defense impeached Stephens-Prince with a statement he gave to police on the morning after the shooting, in which he did not say anything about the skin tone of either person he saw by the car. (Id. at 1384.)

## F.    Summations

### 1.    The Defense's Summation

The defense's strategy in summation was to concede that Watson was guilty of first degree robbery and to attempt to undermine the case for first and second degree murder. The defense conceded that Watson was one of the two individuals who were involved in the armed robbery of Patrick Morris. (See Tr. 1410-11.) It put forward a theory that Watson and Harvey robbed Morris together, and Harvey shot Morris.

The defense attacked the People's eyewitnesses—Curt Phillips, Loren Hillery, and Ramcess Jean-Louis—as having given inconsistent testimony regarding their descriptions of the two perpetrators. (Id. at 1386-92.) In particular, the defense highlighted the testimony of Jean-Louis, the only eyewitness who claimed to have seen a gun. According to defense counsel, Jean-Louis insisted that he had always told the police that the man in the gray sweatshirt had the gun. (Id. at 1388.) In fact, Jean-Louis made three statements to the police in the hours following the incident in which he did not say that the man in the gray sweatshirt had the gun. (Id. at 1388-90.) In two of those statements, Jean-Louis had placed the gray sweatshirt on the individual who did not have the gun. (Id. at 1389-90.) Several days later, while testifying before the Grand Jury, Jean-Louis first testified that the man in the gray sweatshirt was the man with the gun. (Id. at 1390-91.) The defense sought to persuade the jury that Jean-Louis changed his story between the

date of the incident and the date he testified before the Grand Jury, urging that he and other witnesses, whether intentionally or not, had conformed their testimony. (Id.)

The defense put forward its theory of the crime, which was that Watson and Harvey were robbing Patrick Morris when Harvey suddenly pulled a gun out of a bag and shot Morris. (Id. at 1393-94.) The defense attacked Harvey's testimony as contradicted by ballistics evidence and biased due to his favorable plea agreement. (Id. at 1394-99.)

Finally, Watson's counsel put forward two defenses. First, the defense raised the affirmative defense that Watson was not armed and had no reasonable grounds to believe that Harvey was armed or that Harvey intended to use deadly force or cause serious physical injury. (Tr. 1405-06.) In addition, the defense argued that Watson's intoxication at the time of the incident rendered him unable to form the intent to cause death. (Id. at 1407-09.)

### 2. The People's Summation

The prosecution argued to the jury that, under the doctrine of acting in concert, Watson was guilty of all of the crimes charged other than first degree murder, whether or not he was the shooter. (Tr. 1418-21.) The prosecutor pointed out that Watson had conceded his involvement in the robbery, making him guilty of felony murder even if he only participated as a lookout. (Id. at 1421.) The People argued that the issue of whether Watson was the shooter or not was only relevant to the question of first degree murder.

Following this introduction, the People sought to emphasize the high quality of the police investigation in this case. The prosecutor told the jury: "And even though you don't have the perspective, you are not watching a lot of cases and intently studying the work of police in different cases, but I would submit, on the basis of this case alone, you can see that this work was

excellent. You can make that judgment." (Tr. 1424.) The defense's objection to this statement was sustained and the Court instructed the jury to disregard it. (Id.) The prosecutor rephrased, however: "You know that a serious crime occurred, and it's incumbent upon the police officer, they have an interest in finding out who did it, getting the right people and making sure they are arrested, that they are brought into custody, and these police officers did that." (Id.) The defense's objection to this statement was overruled. (Id.) The prosecutor stressed the good work the police did to bring in two individuals for a violent crime without any use of force. He ended the conversation about the quality of the investigation, asking rhetorically: "What do you think of the work of the police officers, and did they not fully follow every lead?"[7] (Id. at 1426.)

After reviewing the eyewitness testimony in this case (Tr. 1426-30), the People proceeded through a step-by-step review of the investigation. The People sought to establish a pattern by which Watson consistently admitted to police investigators only what he could not deny. (See, e.g., id. at 1333.). Initially, Watson's story was that he had lost his wallet and whoever found it may have called telephone numbers contained in it from the victim's cell phone. (Id. at 1432-33.) When police called the numbers and learned that only Watson and not some stranger had called during those hours, Watson admitted he made the phone calls but told police that he bought the phone from "Divine." (Id. at 1434.) Once investigators ruled Divine out as a suspect, Watson claimed he was involved in the robbery but only as the lookout, pointing to Jahad Grant as the killer. (Id. at 1435.) Watson even told investigators that Jahad was wearing a gray hooded sweatshirt and carrying a gun. (Id. at 1437.) Watson's girlfriend, however, told police officers that Watson himself was wearing a gray hooded sweatshirt that night. (Id. at 1437-38.) When

---

[7] Defense counsel did not object to this statement.

confronted with this information and the sweatshirt itself, Watson finally admitted that the sweatshirt was his and conceded his participation in the robbery, but claimed that Rakeem Harvey was the one with the gun. (Id. at 1438.) According to the People, this statement only stood because police could not find Harvey to contradict it. (Id. at 1439.)

The prosecution proceeded to describe the investigation and ultimate discovery of Rakeem Harvey, highlighting the persistence of investigators in pursuing Harvey even after Watson was caught and charged. (Id. at 1440.) Noting that the police "continued that investigation until they [found] him," the People stated: "And as we discussed, Detective Bond spoke to him and was able to elicit admissions from Rakeem Harvey that he was involved. And Detective Bond told him, as Rakeem Harvey testified, we know you are not the shooter, but tell us how you were involved." (Id. at 1440-41.) Over objection, the prosecutor stressed to the jury that the detectives had no evidence linking Harvey to the crime until they got him to confess involvement. (Id. at 1441.) The People stated: "Based upon the evidence that you have heard in this trial, if Rakeem Harvey doesn't admit to Detective Bond that he was involved, what other evidence have you heard that ties Rakeem Harvey into this at all?" (Id.) The defense's objection to this statement was overruled. (Id.)

The People then sought to make the case for first degree murder, explaining that it was important to charge one of the suspects with first degree murder because the individual who fired the shot was much more culpable than the other participant in the robbery. (Id. at 1442-43.) Regarding the choice to charge Watson as the shooter, the prosecutor stated:

> And when you think about it, it wasn't a flip-of-the-coin-in-the-air decision. Who had the gun? Who does the evidence point to as having the gun? More importantly, whose statement -- because they each made statements about what

happened. Which one has the ring of truth? Which one makes sense, and which one is absurd.

(Id. at 1445.) The defense's objection to this statement was overruled. (Id.) According to the People, Rakeem Harvey's version of the story made logical sense and was consistent with other evidence, including eyewitness testimony, whereas Watson's story lacked credibility on its face. The People's theory of the crime, consistent with Harvey's testimony, was that Watson arrived at the car first and pointed a gun at Morris. Harvey approached and started taking property, and when Morris resisted, Watson shot him. (Id. at 1448.) Noting that Jean-Louis did make some inconsistent statements, the prosecution argued that the consistent evidence pointed to Watson having the gun. (Id. at 1453-56.)

### G.    State Court Appeal

Watson appealed from his conviction to the New York State Supreme Court, Appellate Division, arguing that the preclusion of cross-examination regarding the Harvey Note and the late disclosure of Brady material violated his constitutional rights. On April 5, 2005, the Appellate Division unanimously affirmed the conviction. Regarding the Brady claim, the Appellate Division ruled:

> The defendant claims that the judgment should be reversed based upon the late disclosure of Brady material. The material at issue was turned over to the defendant before opening statements and in sufficient time for him to use it in a meaningful fashion during cross-examination or as evidence during his case. There was no indication that a reasonable possibility existed that earlier disclosure of the material might have led to a different outcome of the trial.

People v. Watson, 793 N.Y.S.2d 89, 90 (N.Y. App. Div. 2005) (internal citations omitted). Although the Appellate Division did not explicitly address Watson's argument that he was improperly denied the right of cross-examination, it stated summarily that "[t]he defendant's

remaining contentions either are unpreserved for appellate review, without merit, or do not

require reversal."[8] Id. The New York Court of Appeals denied Watson's application for leave to

appeal further on June 20, 2005. See People v. Watson, 834 N.E.2d 1275 (N.Y. 2005).

## II.    Discussion

### A.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal

court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on

the merits" in state court only if it concludes that the state's adjudication of the claim "(1)

resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States; or (2) resulted

in a decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary

to" clearly established Supreme Court law "if it 'applies a rule that contradicts the governing law

set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a

decision of this Court and nevertheless arrives at a result different from our precedent.'" Price v.

Vincent, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853 (2003) (quoting Williams v. Taylor, 529 U.S.

362, 405-406, 120 S. Ct. 1495 (2000)). A state court decision may be said to have involved an

"unreasonable application" of clearly established federal law if the petitioner satisfies his "burden

---

[8] According to Watson, the Appellate Division's initial decision on April 4, 2005
contained additional language, stating that "the sanction imposed by the Supreme Court which
limited the People's ability to cross-examine or comment on a note contained within the Brady
material was an appropriate judicial response and did not constitute reversible error." (See Pet'r
Br. at 29-30.) Watson claims that, after the District Attorney's Office contacted the Appellate
Division to explain that the court had imposed no such sanction, the Appellate Division issued a

to show that the state court applied [Supreme Court law] to the facts of his case in an objectively unreasonable manner." Price, 538 U.S. at 641, 123 S. Ct. at 1853 (internal quotation marks omitted). Accordingly, "'[a] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [federal law] incorrectly.'" Id. (quoting Woodford v. Visciotti, 537 U.S. 19, 24-25, 123 S. Ct. 357 (2002)).

### B.    Petitioner's Claims

Watson raises two claims in his habeas corpus petition. First, petitioner argues that the trial court denied him the Sixth Amendment right of confrontation by restricting him from cross-examining Detective Bond regarding his knowledge of Officer Pierce's statements to investigators and his alleged failure to conduct an adequate investigation as to whether Harvey, not Watson, shot Patrick Morris. Second, petitioner argues that the prosecution's delayed disclosure of the Harvey Note constituted suppression of favorable evidence in violation of Brady v. Maryland.

As the parties acknowledge, these claims are not entirely separate from one another.[9] Watson argues that the evidence was "favorable" under Brady both because it could have led to admissible evidence that Harvey was the shooter, and because it was useful for cross-examining detectives regarding their investigation. This second asserted use of the evidence also lies at the heart of petitioner's confrontation clause claim. The Court notes, however, that petitioner did have the evidence in time to cross-examine Detective Bond regarding his investigation, except

---

new decision, also dated April 4, 2005, which simply omitted this language.

[9] See, e.g., Resp't Br. at 2 (noting that petitioner's confrontation clause claim is "inextricably intertwined with defendant's Brady claim"); Pet'r Br. at 65-67 (describing impact of the two alleged violations taken together).

that he was prevented from doing so by the trial court. Accordingly, petitioner's claims divide analytically according to the purposes for which he would have used the evidence. The Court first addresses petitioner's claim under the confrontation clause that he should have been permitted to cross-examine Detective Bond regarding the information coming from Officer Pierce. Next, the Court addresses petitioner's claim under <u>Brady</u> that the prosecution's belated disclosure of the Harvey Note deprived him of the opportunity to develop exculpatory evidence.

### C. The Confrontation Clause Claim

#### 1. Clearly Established Law

The Confrontation Clause of the Sixth Amendment guarantees to each criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Pursuant to this guarantee, it is a clearly established principle of Supreme Court jurisprudence that a criminal defendant must be afforded a meaningful opportunity to cross-examine the witnesses against him. <u>See</u>, <u>e.g.</u>, <u>Maryland v. Craig</u>, 497 U.S. 836, 845, 110 S. Ct. 3157, 3163 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."); <u>Douglas v. Alabama</u>, 380 U.S. 415, 418, 85 S. Ct. 1074, 1076 (1965) ("Our cases construing the [Confrontation C]lause hold that a primary interest secured by it is the right of cross-examination . . . ."); <u>see also</u> <u>Harper v. Kelly</u>, 916 F.2d 54, 56 (2d Cir. 1990) ("Of all the rights covered by the Confrontation Clause, the right to cross-examine witnesses is perhaps the most important."). Noting that cross-examination is "the principal means by which the believability of a witness and the truth of his testimony are tested," the Supreme Court stated in <u>Davis v. Alaska</u> that that "'[t]he main and essential purpose of confrontation is to secure for the

-37-

opponent the opportunity of cross-examination.'" 415 U.S. 308, 315, 95 S. Ct. 1105, 1110

(1974) (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)).

The right to cross-examination, however, is not unlimited. "[T]he Confrontation Clause

guarantees an opportunity for effective cross-examination, not cross-examination that is effective

in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474

U.S. 15, 20, 106 S. Ct. 292, 294 (1985) (per curiam) (emphasis in original). A trial judge has

"wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on

such cross-examination based on concerns about, among other things, harassment, prejudice,

confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally

relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435 (1986).

The Second Circuit has noted that even "erroneous rulings that improperly restrict cross-

examination under state or federal rules of evidence do not necessarily implicate the

Confrontation Clause." Harper, 916 F.2d at 57. The baseline requirement of the Confrontation

Clause is that the accused be given a "full and fair opportunity" to establish before the factfinder

that reasons exist to discredit the witness's testimony. Fensterer, 474 U.S. at 22, 106 S. Ct. at

296 ("[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair

opportunity to probe and expose [a witness's testimonial] infirmities through cross-examination,

thereby calling to the attention of the factfinder the reasons for giving scant weight to the

witness' testimony."). "[T]he question is whether the jury is in possession of facts sufficient to

make a discriminating appraisal of the witness's credibility." Cotto v. Herbert, 331 F.3d 217,

249 (2d Cir. 2003) (internal quotation marks omitted) (citing United States v. Roldan-Zapata,

916 F.2d 795, 806 (2d Cir. 1990), cert. denied, 499 U.S. 940, 111 S. Ct. 1397 (1991)).

Accordingly, a "court should avoid any blanket prohibition on exploration of an area that is central to an assessment of the witness's reliability." United States v. Maldonado-Rivera, 922 F.2d 934, 955 (2d Cir. 1990).

### 2. State Courts' Application of Clearly Established Law

In this case, the trial court restricted the defense from cross-examining the lead homicide detective, Detective Bond, regarding his knowledge of information provided to investigators by Officer Sherry Pierce. The information, memorialized in a note contained in the police file, suggested that Rakeem Harvey, not Darrell Watson, was the one who shot Patrick Morris. Had the defense sought to use this information for the truth of the proposition that Rakeem Harvey shot Patrick Morris, it would indeed have constituted several layers of inadmissible hearsay. The information allegedly originated with Harvey and his mother, who told her friend Sonja Pierce, who in turn informed Officer Sherry Pierce, who relayed the information to investigators.

That is not the only use the defense sought to make of the note, however. The defense sought to question detective Bond regarding his knowledge of the fact that Officer Pierce had provided this information, independent of whether Officer Pierce's comments were true. Used for that purpose, the evidence contained in the note was not hearsay.[10] See, e.g., Stern v. Waldbaum, Inc., 651 N.Y.S.2d 186, 188 (N.Y. App. Div. 1996) ("Hearsay is defined as an out-of-court statement offered to prove the truth of the matter asserted therein. However, a statement which is not offered to establish the truth of the facts asserted therein is not hearsay."); accord

---

[10] The court permitted other testimony from Detective Bond regarding his knowledge of out-of-court statements. Bond testified that the information that Harvey had been arrested in Georgia "came through anonymous information," which he heard from unspecified "individuals in the streets." (Tr. 1152-53.)

United States v. Paulino, 445 F.3d 221, 217 (2d Cir. 2006) (stating that out-of-court statements may be "received in evidence for a purpose other than their truth" as long as the non-hearsay purpose is relevant and "the probative value of the evidence for this non-hearsay purpose [is] not . . . outweighed by the danger of unfair prejudice"); Drummond v. Castro, 522 F. Supp. 2d 667, 674 (S.D.N.Y. 2007) ("When offered for the purpose of establishing [the detective] Defendants' knowledge at the time of their decisions to arrest and prosecute Plaintiff, the DD5 reports are not hearsay, as they are not offered for the truth of the information they contain, but rather to establish a basis for Defendants' finding of probable cause."). The defense proposed to question Detective Bond on his knowledge of the information Officer Pierce conveyed in order to attack the thoroughness of the detectives' investigation and their failure to pursue information they received pointing to an alternative suspect as the shooter.[11]

The Supreme Court has recognized the importance of this line of questioning. In Kyles v. Whitley, the prosecution withheld from the defense certain evidence, including various out-of-court statements made to the police by an informant known as "Beanie" who was never called to testify at trial, as well as a prior statement by another witness describing the culprit as matching

---

[11] Indeed, defense counsel may not have had to introduce the note itself in the first instance. Counsel could have asked Detective Bond whether he received information from a police officer pointing to Harvey as the shooter, introducing the note as impeachment evidence only if Detective Bond denied receiving that information. The court could have reduced the danger of unfair prejudice to the prosecution by instructing the jury on the limited purpose for which it could consider the testimony. See Williams v. Muhammad's Holy Temple of Islam, Inc., No. 00 CV 1251, 2006 WL 297448, at *6 (E.D.N.Y. Feb. 8, 2006) ("Although the letters contain out-of-court statements, they do not constitute hearsay because they are not being offered to prove the truth of the matters asserted therein. Rather, plaintiff seeks to admit or refer to the letters for the fact that they were sent and received and for the effect they had on the recipients. They are therefore admissible. The court will instruct the jury on the limited purposes for which they may consider the letters, and will address any authenticity issues at trial." (internal citations

Beanie's description. 514 U.S. 419, 428, 115 S. Ct. 1555, 1563 (1995). The Supreme Court

noted that, even if the defendant did not call Beanie to testify, "the defense could have examined

the police to good effect on their knowledge of Beanie's statements and so have attacked the

reliability of the investigation in failing even to consider Beanie's possible guilt and in tolerating

(if not countenancing) serious possibilities that incriminating evidence had been planted." Id. at

446, 115 S.Ct. at 1571-72 (emphasis added); see also id. at 445, 115 S.Ct. at 1571 (stating that, if

disclosed, "Beanie's various statements would have raised opportunities to attack . . . the

thoroughness and even the good faith of the investigation"). Even without using the statements

for their truth or to impeach Beanie himself, "[b]y demonstrating the detectives' knowledge of

Beanie's affirmatively self-incriminating statements, the defense could have laid the foundation

for a vigorous argument that the police had been guilty of negligence." Id. at 447, 115 S. Ct. at

1572. Regarding the other witness's statements, the Supreme Court stated that "[t]he defense

could have further underscored the possibility that Beanie was [the] killer through cross-

examination of the police on their failure to direct any investigation against Beanie." Id. at 442

n.13, 115 S.Ct. at 1569.

Other courts similarly have recognized the effectiveness in certain cases of attacking the

quality of the police investigation. See, e.g., United States v. Howell, 231 F.3d 615, 625 (9th

Cir. 2000) (finding that the government has a "duty to disclose evidence of a flawed police

investigation," which could be used by defense counsel "to attack the thoroughness, and even

good faith, of the investigation"); Bowen v. Maynard, 799 F.2d 593, 613 (10th Cir. 1986) ("A

common trial tactic of defense lawyers is to discredit the caliber of the investigation or the

---

omitted)).

decision to charge the defendant, and we may consider such use in assessing a possible Brady violation."); Lindsey v. King, 769 F.2d 1034, 1042 (5th Cir. 1985) (granting new trial to prisoner convicted in state court where evidence withheld by prosecution "carried within it the potential . . . [for] the discrediting . . . of the police methods employed in assembling the case against him"); Orena v. United States, 956 F. Supp. 1071, 1100 (E.D.N.Y. 1997) ("destroying the bona fides of the police is a tactic that has never lost its place in the criminal defense reasonable doubt armamentarium.").

These concerns are particularly relevant to this case, where the prosecution repeatedly put the caliber of the police investigation at issue. From the beginning of its summation, the People sought to emphasize the high quality of the police investigation in this case, telling the jury: "And even though you don't have the perspective, you are not watching a lot of cases and intently studying the work of police in different cases, but I would submit, on the basis of this case alone, you can see that this work was excellent. You can make that judgment." (Tr. 1424.) Although defense counsel's objection to this particular statement was sustained, the prosecution, over objection, continued to tout the skillfulness of the police work, ultimately asking the jury rhetorically: "What do you think of the work of the police officers, and did they not fully follow every lead?" (Id. at 1426.)

Even with regard to the investigation of Harvey specifically, the People sought to impress the jury with the quality of the police work. Stressing that the police diligently pursued Harvey after Watson was caught, the prosecutor asked rhetorically, over objection: "Based upon the evidence that you have heard in this trial, if Rakeem Harvey doesn't admit to Detective Bond that he was involved, what other evidence have you heard that ties Rakeem Harvey into this at all?"

(Id. at 1441.) Finally, the People argued to the jury, over objection, that the prosecution's decision to charge Watson as the shooter "wasn't a flip-of-the-coin-in-the-air decision" because all of the evidence pointed to Watson, not Harvey, having the gun. (Id. at 1445.) These statements in summation followed lengthy testimony by detectives, through which the People took the jury step by step through the investigation. In essence, the prosecution sought to establish Watson's guilt, in part, by persuading the jury that it should trust the skilled law enforcement personnel and ratify the People's decision to charge Watson, not Harvey, as the shooter.

The prohibited cross-examination would have cast these issues in a different light. The defense could have established before the jury that the police failed to pursue an alternative theory of the crime, which would have exonerated Watson of the most severe charge, even though they had received information from a police officer, purportedly originating with Harvey's family, which suggested that Harvey, not Watson, was the shooter. Without using Officer Pierce's statements for their truth, "the defense could have examined the police to good effect on their knowledge" of Officer Pierce's statements "and so have attacked the reliability of the investigation in failing even to consider" the possibility that Harvey had the gun. Kyles, 514 U.S. at 446, 115 S.Ct. at 1571-72. This questioning would have undermined the People's claim that charging Watson as the shooter was an obvious choice because all of the evidence pointed to him. The defense could have shown that, in fact, the police had evidence pointing to an alternative suspect as the shooter but admittedly failed to pursue it because they did not think it was important.

In addition, the cross-examination would have presented a different perspective on

Detective Bond's questioning of Harvey once he was found in Georgia. Detective Bond testified that, although he spent approximately "a day and a half" with Harvey, he never asked him whether he had shot Patrick Morris or confronted him with statements indicating that he had the gun. (Tr. 1166-67.) Harvey, for his part, testified that when he met Detective Bond following his arrest in Georgia, Detective Bond told him that "he kn[e]w that I didn't kill the guy." (Id. at 1324.) Without the benefit of the defense's cross-examination, the jury may have understood these statements simply as further indicia of the detectives' certainty they had identified the correct suspect as the shooter. Understood against the backdrop of Detective Bond having received information from a police officer pointing to Harvey as the shooter, however, the defense could have argued that this testimony further supported its argument that investigators failed to seriously consider the possibility of Harvey's guilt.

In sum, the defense could have suggested to the jury that, rather than charging Watson as the shooter because all evidence pointed to him, the prosecutors and the police found it easier to bargain with Harvey and seek the maximum charge against Watson, whom they had in custody for a full year before Harvey was found, who had been identified in lineups immediately following the incident, and who had made numerous statements to police that prosecutors could use against him. See Mendez v. Artuz, No. 98 Civ. 2652, 2000 WL 722613, at *20 (S.D.N.Y. June 6, 2000), aff'd 303 F.3d 411 (2d Cir. 2002) (granting habeas corpus in part because suppressed evidence would have enabled the defense to "argue[] that it was easier for the police to charge Mendez with killing Johnny than to search for another killer"). The People had none of this evidence against Harvey because Harvey fled the state shortly after the murder, making the case against him more difficult. The defense's capacity to present this argument was

substantially weakened; the defense was prevented from establishing before the jury that the prosecution's assertions that the police "fully follow[ed] every lead," that Harvey's confession was the only evidence the police had connecting him to the murder, and that all evidence pointed to Watson as the shooter, were all false.

Furthermore, this Court is not left to speculate whether Detective Bond's testimony in the face of such cross-examination would have been damaging to the People's case. Detective Bond testified, outside the presence of the jury, that when he received Officer Pierce's information pointing to Harvey having the gun, it was "not of any importance" to him. (Tr. 1103.) Contrary to the People's contention that detectives "follow[ed] all the leads," Detective Bond testified that he did not follow up on this information with Officer Pierce because he believed it was not important. (Id.) The jury was not permitted to hear this testimony. If the jury had heard that the police received information supporting an alternative theory of the crime and brushed it off as unimportant, it may have raised doubts in the jury's mind whether the People rushed to judgment against Watson rather than pursuing the leads more fully. Although the adequacy of the police's investigation except in so far as it supports a claim of insufficient evidence, may often be irrelevant, here the prosecution made it an issue.

Detective Bond's explanation for his failure to follow up on information received from Officer Pierce was perplexing, and likely would have damaged the People's case. Detective Bond testified, outside the presence of the jury, that the information was "not of any importance" to him because "the information [Officer Pierce] gave [him] was information that was already basically known that Keemie was involved." (Tr. 1103.) When pressed regarding the fact that the tip pointed to Harvey having the gun, Detective Bond replied: "As I stated, that was not of

any importance to me, because the defendant, Darrell Watson, had already said that Keemie had the gun." (Id.) Taken seriously, these statements suggest that Detective Bond already thought that Harvey might be the shooter when he received Officer Pierce's information. If that were the case, however, it is bewildering why Detective Bond would not have pursued the information, which could possibly have unearthed some evidence to support his working theory of the crime. His explanation is also at odds with the fact that, when he met Harvey in Georgia, he never confronted Harvey with information suggesting that he was the shooter.[12]

As the Court has noted above, not all erroneous restrictions on cross-examination amount to a deprivation of federal constitutional rights. In this case, however, the trial court imposed a "blanket prohibition on exploration of an area that [was] central to an assessment of [Detective Bond's] reliability," Maldonado-Rivera, 922 F.2d at 955, on the issue of the caliber of the investigation, an issue brought to the forefront by the People itself. This blanket restriction left the jury unable to form a "discriminating appraisal" of the detectives' testimony, as well as the People's claims in summation. Cotto, 331 F.3d at 249; see also Fensterer, 474 U.S. at 22, 106 S.Ct. at 296 (stating that the defense should be permitted to "call[] to the attention of the factfinder the reasons for giving scant weight to the witness' testimony"). As illustrated by Detective Bond's testimony outside the presence of the jury, the prohibited cross-examination would have enabled defense counsel to attack the thoroughness and reliability of the

---

[12] Watson suggests an alternative explanation for Bond's testimony, which is that he was expressing sarcasm and dismissiveness toward the possibility that Harvey was the shooter. On the cold record, this Court is unable to determine whether this is true. Were this the case, the jury may have been left wondering why Detective Bond treated the decision to charge one suspect over the other with First Degree Murder so cavalierly, further reinforcing the defense's argument that the police never seriously considered Harvey's possible guilt.

investigation. Totally depriving Watson of the ability to present this defense, while allowing the People to tout the caliber of investigation, violated his rights under the Confrontation Clause.

### 3.     Harmless Error

It is well-settled that violations of the Confrontation Clause are subject to a harmless error analysis. See Van Arsdall, 475 U.S. at 684, 106 S. Ct. at 1438; Cotto v. Herbert, 331 F.3d 217, 253 (2d Cir. 2003). To determine whether the error was harmless in these circumstances, courts apply the test set forth in Brecht v. Abrahamson, 507 U.S. 619, 113 S. Ct. 1710 (1993). See Fry v. Pliler, 551 U.S. 112, 127 S. Ct. 2321 (2007); Brinson v. Walker, 547 F.3d 387, 395 (2d Cir. 2008). Under this standard, an error is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637, 113 S. Ct. at 1722 (internal citation and quotation marks omitted); see Brinson, 547 F.3d at 395.

The Supreme Court has identified a series of factors to consider in determining whether an erroneous limitation on cross-examination was harmless: "[1] the importance of the witness' testimony to the prosecution's case, [2] whether the testimony was cumulative, [3] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, [4] the extent of cross-examination otherwise permitted, and . . . [5] the overall strength of the prosecution's case." Van Arsdall, 475 U.S. at 684, 106 S. Ct. at 1438; see also Brinson, 547 F.3d at 395; Cotto, 331 F.3d at 254. In addition, the Second Circuit has explained that courts should consider "whether the cross-examination of which the defendant was deprived was of a nature that was likely to affect the result." Brinson, 547 F.3d at 398 (stating that this factor is "[a]t least as important" as the factors expressly enumerated in Van Arsdall). Of these factors, "the weight of the prosecution's case against the defendant is the most significant." Samuels v.

Mann, 13 F.3d 522, 526 (2d Cir. 1993) (citing United States v. Columbo, 909 F.2d 711, 714 (2d Cir. 1990)); see also, e.g., Glenn v. Bartlett, 98 F.3d 721, 729 (2d Cir. 1996) ("The most dispositive factor in this analysis is the overall strength of the prosecution's case."); Hernandez v. Filion, No. 03 Civ. 6989, 2004 WL 286107, at *16 & n.33 (S.D.N.Y. Feb. 13, 2004) (citing cases). Accordingly, the Court turns to this factor first.

With regard to second degree felony murder and lesser counts, the case against Watson was very strong. Among other evidence, Watson confessed to having been involved in the robbery of Patrick Morris, which resulted in his death. In addition, two eyewitnesses identified Watson as having been the individual with light skin, glasses, and a gray sweatshirt, who was seen standing at the car shortly after a gunshot was heard. Watson's ex-girlfriend testified that he arrived at her apartment that evening around 2:00 a.m. wearing a gray hooded sweatshirt with a Tommy Hilfiger logo, which matched descriptions given by eyewitnesses, and which Watson admitted he owned. Furthermore, the victim's cell phone was recovered from a drawer in Watson's work place, and telephone numbers found in Watson's wallet were called from the victim's phone following the incident.

Watson was only convicted on one count, however, which was first degree murder pursuant to § 125.27(1)(a)(vii) of the New York Penal Law. Under this provision, Watson could only be convicted of first degree murder if he intentionally caused the victim's death. See N.Y. Penal L. § 125.27(1)(a)(vii) ("A person is guilty of murder in the first degree when . . . [w]ith intent to cause the death of another person, he causes the death of such person or of a third person; and . . . the victim was killed while the defendant was in the course of committing or attempting to commit and in furtherance of robbery . . . ."). In practical terms, unlike the other

charges Watson faced at trial, this conviction required the People to prove more than Watson's involvement in the robbery. The jury had to conclude beyond a reasonable doubt that Watson was in fact the one who shot Patrick Morris.

In support of its first degree murder charge, the People presented a theory of the crime that was consistent with Harvey's testimony. According to this theory, Watson, who had light skin and was wearing a gray hooded sweatshirt and glasses, arrived at the car first and, standing outside the vehicle, pointed a gun at Morris. Harvey, who had dark skin and was dressed differently, leaned into the car and began taking Morris's belongings. When Morris resisted, Watson shot him. Then, when Morris's friends approached, Watson turned to them and said something to the effect of, "Nothing happened." Harvey, who was inside the vehicle taking Morris's belongings, was heard saying something to the effect of, "the more you resist, the more it's gonna hurt."

The prosecution's case in support of this theory, while grounded in the evidence, was not overwhelming. The only witness who claimed to have seen Watson shoot Morris was Harvey himself, who as Watson's accomplice was the only other possible shooter. Other than Harvey, only one witness at the scene—Ramcess Jean-Louis—claimed to see anyone with a gun, and this was after the shooting had taken place.[13] Although he did not identify Watson in a lineup, Jean-Louis testified that he saw a gun in the hand of the man who had light skin, who was wearing a gray hooded sweatshirt and glasses, and who was standing outside the vehicle throughout the incident. (Tr. 746-47.) This testimony is consistent with Harvey's version of the events. In the

---

[13] Fred Burns, who testified pursuant to a cooperation agreement, also testified that Watson revealed a gun to him at a party earlier in the evening.

early morning hours following the shooting, however, Jean-Louis made several statements to police, and in none of them did he describe the man with the gray hooded sweatshirt as having a gun. (Id. at 792-94.) In fact, in an audio taped statement following the incident, Jean-Louis told detectives that the man leaning into the car with his body, not the man standing outside the vehicle, was wearing a gray hooded sweatshirt. (Id. at 775-76.)

More importantly, eyewitness testimony regarding the two suspects was not consistent. Harvey testified that Watson stood toward the front of the vehicle in a gray hooded sweatshirt and glasses, pointing a gun, while he, Harvey, positioned himself closer to the rear of the vehicle and leaned in through the window. Jean-Louis's testimony in court is consistent with this version of events, putting the light-skinned man in the gray sweatshirt with a gun toward the front of the vehicle, standing throughout the encounter.

Curt Phillips's testimony, however, differs in important respects. Phillips testified that the man he later identified as Watson, dressed in a gray hooded sweatshirt, stood toward the rear of the car in relation to the other suspect, not toward the front as Jean-Louis had positioned him. Contrary to the prosecution's theory that Watson stood throughout the incident, pointing a gun at Morris from outside the vehicle while Harvey leaned in and robbed him, Phillips testified that the light-skinned man "who was in the car, closest to the back of the car where I was looking at down the sidewalk, he pulled his body out and he turned and told [Jean-Louis], 'no, there's no problem here. There's nothing going on.' . . . Then he turned back, put his head back down and he looked like he continued doing whatever he was doing."[14] (Tr. 813.) This testimony, which

---

[14] Hillery did not testify to whether Watson was positioned toward the front or the rear of the vehicle. Dumke likewise did not testify regarding the assailants' positioning.

places Watson toward the back of the car, leaning inside to perform the robbery, is inconsistent with Harvey's testimony and with the People's theory of the case.

Similarly, Jeffrey Stephens-Prince, who did not know Morris or his friends, presented a version of events that was more consistent with Watson's story than with Harvey's. Stephens-Prince testified that the man in the gray hooded sweatshirt and glasses (i.e. Watson) was leaning into the vehicle, stating "give it up. Give it up," while the man with darker skin (i.e. Harvey) was standing up toward the front of the car, behind the man who was leaning in the car. This testimony is inconsistent with the People's theory of the case, which asserts that Watson shot Morris from his upright position outside the vehicle. In sum, while the evidence that Watson participated in the crime was strong—indeed, perhaps overwhelming—the case for Watson as shooter was not clear cut.

Turning to the other <u>Van Arsdall</u> factors, the nature of the People's case for first degree murder elevated the importance of testimony by detectives, including Detective Bond, regarding their investigation of the murder. The People relied on this testimony to earn the jury's trust that, as between Watson and Harvey, detectives and ultimately the District Attorney's office had identified the correct suspect as the shooter. Although Detective Bond's testimony overlapped with that of other detectives in some respects, as lead homicide detective his testimony was particularly central to establishing the investigation's reliability.

In light of the circumstances of this case, the Court concludes that "the cross-examination of which the defendant was deprived was of a nature that was likely to affect the result." <u>Brinson</u>, 547 F.3d at 398. The Court has already described the damaging effect that the defense's proposed cross-examination, and the testimony Detective Bond did render outside the jury's

presence, would have had on the People's case. In addition, the cross-examination may have bolstered the defense's claim that Morris's friends who were eyewitnesses may have conformed their testimony, perhaps unintentionally, to implicate the suspect who was in custody as the shooter. The defense could have paired this argument with an assertion that the police, too, directed their efforts at Watson out of convenience, neglecting to pursue the alternative possibility that Harvey was the shooter because Harvey could not be found.

Taking into account all of these factors, the Court cannot conclude that the confrontation clause error was harmless.

The case of Mendez v. Artuz, No. 98 Civ. 2652, 2000 WL 722613 (S.D.N.Y. June 6, 2000) ("Mendez I"), aff'd 303 F.3d 411 (2d Cir. 2002) ("Mendez II"), supports this result. In Mendez, the petitioner was convicted for the shooting murder of one victim and the attempted murder of two others. The victims had been standing on a sidewalk in the Bronx when suddenly a man approached from across the street, pulled a machine gun from his waist, and opened fire, killing one victim and injuring two others. Mendez I, 2000 WL 722613 at *1. Two eyewitnesses identified Mendez as the shooter, despite some prior inconsistent statements, and two other witnesses testified that Mendez was not the shooter. Id. at *2.

After trial, during Mendez's direct appeal, the District Attorney's office disclosed five documents pursuant to Brady v. Maryland containing hearsay statements that an individual named Oswaldo D. Rodriguez had ordered one of the victims killed. For example, one of the documents was a handwritten memo from an Assistant District Attorney, stating:

> I received a call from Det. Willie Martinez that he received information from
> officers in Va., that 2 individuals who they have under arrest stated that an
> individual named Oswaldo D. Rodriguez put out a hit (ordered the killing) of

Johnny Rodriguez. Oswaldo ordered the hit because he believed that Johnny stole his money & purchased a Mercedes.

Id., at *6. Another note, from Detective Martinez's file, stated:

Romul[o] Alberto DeLeon-Virginia Prison states Oswaldo Daniel Rodriguez informed him that Johnny Rodriguez had his mother[']s apartment robbed of $100,000.00 cash that he had put away there. Oswaldo stated that because of this he ordered to have him hit.

Id. These documents, along with the others at issue in Mendez, see id. at *6-*8, bear a striking similarity to those at issue in this case. They contained multiple layers of hearsay, but pointed toward an alternative theory of the crime than that charged by prosecutors. Although the suppressed evidence in Mendez did not directly implicate a different person as the shooter, as did the evidence in this case, it presented an alternative theory of motive to the one advanced by the prosecution at trial.

When questioned about these materials, the detective in Mendez testified that he did receive these leads, but "the extent of his investigation into the information was to ascertain whether Oswaldo had filed a police complaint report for the robbery. Since no complaint had been filed, Detective Martinez dropped the investigation because '[i]t didn't have anything to do with the homicide as far as [he] was concerned." Id., at *9 (citations to record omitted). The prosecutor testified that she did not follow up on the information either "because she 'expected that whatever was to be done regarding that would have been done' by former ADA Browne and Detective Martinez." Id.

The District Court granted Mendez's petition for habeas corpus, finding that the suppression of favorable evidence undermined confidence in the outcome of the trial. Id. at *20-*21. Even though the information contained in the suppressed documents was hearsay, the court

concluded that Oswaldo's statement was against penal interest and therefore could have been admitted. Id. at *14-*17. Of course, this exception to the hearsay rule would not have overcome the other layers of hearsay without further development. The court further concluded, however, that if disclosed prior to trial, the hearsay evidence would have provided the defense with important investigative leads. Id. at *18. Finally, the court concluded that the suppressed evidence would have undercut the thoroughness and good faith of the police investigation:

> Disclosure of the police inaction, as set forth above, could have helped the defense undermine the prosecution's case. For example, after pointing out that Detective Martinez had failed to pursue information that Johnny Rodriguez had been shot in revenge for stealing $100,000 from Oswaldo rather than in revenge for the shooting at Mendez by Johnny's acquaintance, the defense could have argued that it was easier for the police to charge Mendez with killing Johnny than to search for another killer." Id. at *20 (citing Kyles, 514 U.S. at 445-46, 115 S.Ct. at 1571-72; Smith v. Secretary of New Mexico Dep't of Corrections, 50 F.3d at 829-30; Bowen v. Maynard, 799 F.2d at 613).

Id. at *20.

The Second Circuit affirmed "substantially for the reasons stated in the thorough and convincing opinion" of the District Court. Mendez II, 303 F.3d at 412. The court agreed that the defense could have used the suppressed evidence either through the presentation of testimony or in cross-examination to challenge the prosecution's theory of motive, creating reasonable doubt where none otherwise existed. Id. at 412-13. The court further agreed that "[t]he defendant could have used the suppressed information to challenge the thoroughness and adequacy of the police investigation." Id. at 416 (citing Kyles, 514 U.S. at 446 n.16). Noting that the detective's explanation of his failure to follow leads—that the evidence "didn't have anything to do with the homicide"—was "to say the least, inadequate," the court held that "[t]he absence of any credible investigation could have allowed Mendez to present a strong challenge to the thoroughness and

reliability of the police work." Mendez II, 303 F.3d at 416.

Because the evidence in Mendez was not disclosed until after trial, the defense's inability to use it to challenge the reliability of the police work was properly analyzed under Brady. Here, on the other hand, the prosecution disclosed the evidence in time for the defense to cross-examine detectives, but the defense was prohibited from putting it to appropriate and effective use. Although the issue of cross-examination in this case is therefore more appropriately analyzed under the confrontation clause, the error rendered the defendant's trial equally unfair, and this Court sees no reason why the result should be different.

For all of the foregoing reasons, this Court concludes that the decision of the appellate court affirming the trial court was an unreasonable application of clearly established federal law.

## D.     The **Brady** Claim

The Court now turns to Watson's claim that suppression of the Harvey note violated Brady because it could have led to admissible exculpatory evidence. The prosecution in criminal cases has a constitutional obligation under the due process clause to disclose evidence favorable to an accused, whether or not it is requested by the defense, where the evidence is material either to guilt or to punishment. See, e.g., Strickler v. Greene, 527 U.S. 263, 280-82, 119 S. Ct. 1936, 1948 (1999); United States v. Bagley, 473 U.S. 667, 676, 682 105 S. Ct. 3375, 3380, 3383-84 (1985); United States v. Agurs, 427 U.S. 97, 107, 96 S. Ct. 2392, 2399 (1976); Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1972). The prosecution's duty under Brady and its progeny is well settled:

> To the extent that [a] prosecutor knows of material evidence favorable to the
> defendant in a criminal prosecution, the government has a due process obligation
> [grounded in the 14th Amendment] to disclose that evidence to the defendant.

> Information coming within the scope of this principle . . . includes not only
> evidence that is exculpatory, i.e., going to the heart of the defendant's guilt or
> innocence, but also evidence that is useful for impeachment, i.e., having the
> potential to alter the jury's assessment of the credibility of a significant
> prosecution witness.

United States v. Gil, 297 F.3d 93, 101 (2d Cir. 2002) (alterations in original) (quoting Leka v.

Portuondo, 257 F.3d 89, 98 (2d Cir. 2001)). A Brady violation requires three elements. First,

"[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or

because it is impeaching." Strickler, 527 U.S. at 281-82, 119 S. Ct. at 1948. Second, "that

evidence must have been suppressed by the State, either willfully or inadvertently." Id. at 282,

119 S. Ct. at 1948. Finally, the evidence must be "material," meaning that its suppression

resulted in prejudice. Id. at 281-82, 119 S. Ct. at 1948; see also Kyles, 514 U.S. at 434, 115 S.

Ct. at 1565-66.

### 1.    Favorable Evidence

The alleged Brady material was favorable to the accused. The note contained exculpatory

evidence because it tended to implicate an alternative suspect as the shooter. Although the note

contained hearsay, a Brady violation does not require that the undisclosed evidence would have

been admissible at trial. A court need only conclude that "[1] either all or part of the . . . memo is

admissible; [2] the memo could lead to admissible evidence; or [3] the memo would be an

effective tool in disciplining witnesses during cross-examination by refreshment of recollection

or otherwise." United States v. Gil, 297 F.3d 93, 104 (2d Cir. 2002). The probability that

disclosure of the note would have led to admissible evidence exculpating Watson of first degree

murder bears on the issue of materiality, which this Court discusses below. Id. (noting that

admissibility is a "consideration that bears on Brady materiality"). Regardless, "[t]he evidence at

issue was . . . of a kind that would suggest to any prosecutor that the defense would want to know about it." Leka, 257 F.3d at 99. Indeed, the prosecutor at trial recognized that the evidence was favorable to Watson, stating early in the proceedings that he could "see the importance of [the document] on its face to the defense" and recognizing that the document's "source might be somebody that's helpful to them on their case." (Tr. 605-06.) The Court agrees with this observation, and concludes that the Harvey Note was favorable to the defense.[15] See, e.g., United States v. Manning, 56 F.3d 1188, 1198 (9th Cir. 1995) (noting that a "report was potentially exculpatory, because it identified an alternative suspect"); Miller v. Angliker, 848 F.2d 1312, 1321-22 (2d Cir. 1988) (granting writ of habeas corpus where State failed to disclose evidence suggesting that another individual might have committed the murders for which defendant pled guilty); see also, e.g., People v. Robinson, 133 A.D.2d 859, 859-60 (N.Y. App. Div. 1987) (holding that statement obtained by police from individual implicating three men other than defendants as the perpetrators was Brady material even though police considered the statement unreliable); People v. Lumpkins, 533 N.Y.S.2d 792, 795-97 (N.Y. Sup. Ct. 1988) (holding that prosecution had duty to disclose information that a witness called police and reported that individuals other than defendant were the murders).

### 2.    Failure to Disclose

There is no set deadline under Brady for the disclosure of favorable evidence. Instead, the proper timing of disclosure under Brady is understood in terms of the defense's opportunity to make use of the evidence once it is disclosed. See Leka, 257 F.3d at 100 ("It is not feasible or

---

[15] As discussed above, the note was also favorable because it could have been used to impeach the credibility and reliability of the police investigation. See Kyles 514 U.S. at 445-46,

desirable to specify the extent or timing of disclosure <u>Brady</u> and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made."). Although pretrial disclosure is not mandated in all circumstances, the law is settled that "<u>Brady</u> material must be disclosed in time for its effective use at trial." <u>United States v. Coppa</u>, 267 F.3d 132, 135 (2d Cir. 2001). In particular, favorable evidence that has a "material bearing on defense preparation" must be disclosed prior to trial if further development by defense counsel would be necessary in order to put it to effective use. <u>Grant v. Alldredge</u>, 498 F.2d 376, 382 (2d Cir. 1974). In <u>Grant</u>, the Second Circuit held:

> Although it well may be that marginal <u>Brady</u> material need not always be disclosed upon request prior to trial, the fact that [an eyewitness identified an alternative suspect as having committed the crime] was without question specific, concrete evidence of a nature requiring pretrial disclosure to allow for full exploration and exploitation by the defense. This information, so withheld by the Government, would have had a material bearing on defense preparation, and therefore should have been revealed well before the commencement of the trial.

<u>Id.</u> at 382 (internal quotation marks and citations omitted). The court in <u>Grant</u> ordered a new trial, finding that disclosure of the evidence in question during trial was insufficient to satisfy the Government's <u>Brady</u> obligations. <u>Id.</u> at 382-83.

The Second Circuit reaffirmed this principle in <u>Leka v. Portuondo</u>, 257 F.3d 89 (2d Cir. 2001), in which the court reversed the denial of a writ of habeas corpus, ordering that the writ be granted due to prosecutors' delayed disclosure of favorable evidence. In <u>Leka</u>, state prosecutors disclosed "nine days before opening arguments and twenty-three days before the defense began its case" that an off-duty police officer had witnessed the shooting at issue and did not identify the defendant as the shooter. <u>Id.</u> at 93, 100. Unbeknownst to defense counsel, the off-duty

---

115 S. Ct. at 1571-72.

officer had made further observations regarding the shooting that were inconsistent in certain important respects with other eyewitness testimony presented at trial. See id. at 92-93. Citing Grant, the Second Circuit held that the prosecution's belated disclosure was insufficient:

> The limited Brady material disclosed to Leka could have led to specific exculpatory information only if the defense undertook further investigation. When such a disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired. The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing. And the defense may be unable to assimilate the information into its case.

Id. at 101. The court further observed that "a disclosure made on the eve of trial (or after trial has begun) may be insufficient unless it is fuller and more thorough than may have been required if the disclosure had been made at an earlier stage." Id.

These principles of Brady law are now firmly established. The Second Circuit has reaffirmed that

> Brady information must be disclosed . . . in a manner that gives the defendant a reasonable opportunity either to use the evidence in the trial or to use the evidence to obtain evidence for use in the trial. Thus, the Government must make disclosures in sufficient time that the defendant will have a reasonable opportunity to act upon the information efficaciously.

United States v. Rodriguez, 496 F.3d 221, 226 (2d Cir. 2007); see also United States v. Rittweger, 524 F.3d 171, 180-81 & n.4 (2d Cir. 2008) ("Complying with the Jencks Act . . . does not shield the government from its independent obligation to timely produce exculpatory material under Brady . . . ."); DiSimone v. Phillips, 461 F.3d 181, 196-97 (2d Cir. 2006) ("The more a piece of evidence is valuable and rich with potential leads, the less likely it will be that late disclosure provides the defense with an 'opportunity for use.'" (quoting Leka, 257 F.3d at 103)); United States v. Gil, 297 F.3d 93, 105-108 (2d Cir. 2002) (ordering new trial where Government

disclosed two-page memorandum containing favorable information on Friday before Monday trial date among two boxes of "3500 material"). In addition, such disclosures "must be sufficiently specific and complete to be useful." Rodriguez, 496 F.3d at 226.

These authorities compel the conclusion that the Brady material at issue in this case was disclosed too late. Although the defense first requested Brady material more than a year before Watson's trial began, the prosecution did not disclose the Harvey Note until the second day of jury selection.[16] Even then, the prosecution provided the note within a large stack of other materials without identifying it as Brady material. Although defense counsel discovered the note anyway, the disclosed copy was partially redacted and not sufficiently legible for defense counsel to determine who wrote it—only that it appeared to say "Keemie Harvey, a/k/a Keemie Cooke. Keemie had gun and went off accidentally." (Tr. 460.) Following this initial, incomplete disclosure, the prosecution dragged its feet, repeatedly resisting requests by defense counsel for more information regarding the note and its source.[17] It was not until six days later, after the People had presented the testimony of eighteen witnesses, and following the court's order that the People locate the original note immediately, that the prosecution disclosed Officer Pierce as

---

[16] Watson's Brady requests specifically sought evidence like the suppressed note. More than a year prior to trial he requested "the names of any witnesses . . . who identified or named a person(s) other than Darrell Watson as the perpetrator of the crimes charged" and any evidence that Watson "was not armed with a deadly weapon." (Pet'r Br. at 3-4.) Subsequent requests sought material relating to the police investigation of Rakeem Harvey, and any evidence "that someone other than Mr. Watson was the person who actually shot Patrick Morris." (Id.)

[17] (See, e.g., Tr. 609 ("I'm not saying that I'm going to discountinue looking, but, in terms of defense counsel demands today that I locate every officer who was involved in this case . . . I think I'm going about this as reasonably as can be expected . . . it's not reasonable, and I'm not in any position to do that."); Id. at 1075 ("To me, [Officer Pierce] said it was like vague information. And this isn't even the only thing that was stated. . . . She indicated essentially that she heard he was involved."); Id. at 1080 (arguing that prosecution should not have to contact

–60–

the source of the information. Indeed, related information continued to trickle out during the remainder of the trial, with the production of Officer Pierce and Detective Bond's testimony outside the presence of the jury providing more context. Sonja Pierce was not disclosed as the source of Officer Pierce's information until after twenty of the prosecution's twenty-six witnesses had completed their testimony.

Despite this late disclosure, the record reveals that the prosecution was aware of the note well in advance of trial. When the partially legible note was first disclosed, the prosecutor admitted having made the redactions on it, even while taking the position that he should not have to act expeditiously in finding a more legible copy. (Tr. 609-11.) Furthermore, the Supreme Court has made clear that for Brady purposes the prosecution is charged with knowledge of information gathered by the police in the course of its investigation. In Kyles, the Supreme Court held that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." 514 U.S. at 437, 115 S.Ct. at 1567; see also Strickler, 527 U.S. at 280-81, 119 S. Ct. at 1948 (stating that the Brady rule "encompasses evidence 'known only to police investigators and not to the prosecutor'" (quoting Kyles, 514 U.S. at 437, 115 S. Ct. at 1567)); Gil, 297 F.3d at 106-07 ("The government is reasonably expected to have possession of evidence in the hands of investigators, who are part of the 'prosecution team'"); United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995) ("The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation."). Because Officer Pierce conveyed her information to investigators shortly after the murder, the prosecution "thus constructively possessed the

Detective Antoine right away, stating: "I've pursued this pretty aggressively, I think").)

[Harvey] memo long before it was turned over to the defense." Gil, 297 F.3d at 106-07. At a minimum, this rule also charges the prosecution with knowledge that the information came from Officer Pierce, which prosecutors likewise were obligated to turn over in advance of trial but failed to do so.[18]

As respondent points out and the trial court ruled, the information in the Harvey note was hearsay if offered for the purpose of proving that Harvey, not Watson, was the one who shot Patrick Morris. The note was only useful for an exculpatory purpose, therefore, if disclosed with enough time for defense counsel to conduct an investigation and potentially develop it into admissible evidence. The prosecution's late disclosure was insufficient because it did not leave the defense with "a reasonable opportunity . . . to use the evidence to obtain evidence for use in the trial." Rodriguez, 496 F.3d 221 at 226.

Respondent argues that petitioner's failure to seek a continuance in order to develop such evidence undermines his Brady claim. The Second Circuit addressed and rejected the same argument in Grant, stating:

> We refuse ... to infer from the failure of defense counsel, when surprised at trial, to seek time to gather other information on [the suppressed witness], that defense counsel would have by-passed the opportunity had the prosecutor apprised him of the [evidence] at a time when the defense was in a reasonable pre-trial position to evaluate carefully all the implications of that information. Given the time for preparation which counsel was denied by the belated disclosure, it seems to us counsel might have pursued a course of inquiry which would have resulted in ferreting out ... relevant ... information.

---

[18] It is not clear whether this doctrine extends the prosecution's constructive knowledge to the fact that the information originated with Rakeem Harvey's mother, which was not revealed until after twenty out of twenty-six prosecution witnesses had been called. Disclosure of Officer Pierce as the source of the information, however, would have provided the defense with the lead required to discover that fact.

498 F.2d at 382; see also Leka, 257 F.3d at 102. Furthermore, "the prosecution is in no position to fault the defense for [an insufficient response] when the prosecution itself created the hasty and disorderly conditions under which the defense was forced to conduct its essential business." Leka, 257 F.3d at 101. Any inadequacy in defense counsel's response to the late disclosure simply "demonstrate[s] how the delayed disclosure of evidence tends to impair the opportunity of the defense to use it." Id.

Accordingly, the Court concludes that the prosecution's belated disclosure of favorable evidence during trial, which it had in its possession for more than a year in advance of trial, amounted to suppression of that evidence under Brady v. Maryland.

### 3. Materiality

Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Youngblood v. West Virginia, 547 U.S. 867, 870, 126 S. Ct. 2188, 2190 (2006). A showing of materiality, however, "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Kyles, 514 U.S. at 434, 115 S. Ct. at 1565-66; see also Youngblood, 547 U.S. at 870, 126 S. Ct. at 2190.

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Id. (quoting United States v. Bagley, 573 U.S. 667, 678, 105 S. Ct. 3375, 3381 (1985)). The words "reasonable probability" are central to this assessment: "The mere possibility that an item

of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." United States v. Agurs, 427 U.S. 97, 109-110, 96 S. Ct. 2392, 2400 (1976) (emphasis added); see also Strickler, 527 U.S. at 291, 119 S. Ct. at 1948 (noting that a "reasonable possibility" of a different result is insufficient and that "petitioner's burden is to establish a reasonable probability of a different result").

The Supreme Court has further emphasized that Brady materiality "is not a sufficiency of the evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Kyles, 514 U.S. at 434-35, 115 S. Ct. at 1566. "One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. To evaluate materiality, therefore, "the omission must be evaluated in the context of the entire record." Agurs, 427 U.S. at 112, 96 S.Ct. at 2402. Once evidence has been deemed material, there is no separate harmless error review. See Kyles, 514 U.S. at 435-36, 115 S.Ct. at 1566.

"One consideration that bears on Brady materiality is admissibility." Gil, 297 F.3d at 104. The prosecution's Brady obligation extends to evidence that is not admissible at trial:

> [T]he Government's obligations under Brady to disclose such information does not depend on whether the information to be disclosed is admissible as evidence in its present form. The objectives of fairness to the defendant, as well as the legal system's objective of convicting the guilty rather than the innocent, require that the prosecution make the defense aware of material information potentially leading to admissible evidence favorable to the defense.

Rodriguez, 496 F.3d at 226 n.4. Such inadmissible evidence may be "material" if it "could lead

to admissible evidence." Gil, 297 F.3d at 104; accord Rodriguez, 496 F.3d at 226 n.4. On the other hand, if there is no indication that such evidence could be developed into material, admissible evidence to be used at trial, the inadmissible evidence would not be considered "material" under Brady because in the absence of new material evidence put before the jury there could be no reasonable probability that the outcome of trial would have been different. See Peeler v. United States, No. 99 CR 67, 02 CV 145, 2005 WL 1719718, at *3 (D. Conn. July 22, 2005) (denying habeas corpus petition in part because alleged Brady evidence, "even if undisclosed, . . . does not constitute Brady material because it was inadmissible and [petitioner] does not show that it could have led to other admissible, material evidence").

Petitioner argues that, by the time the information was disclosed, any chance to develop the information into evidence that could be used at trial was greatly reduced. In particular, petitioner argues that once Harvey made a deal with the prosecution to support its theory that Watson was the shooter, there was "absolutely no chance" that he or his family would implicate him as the shooter because doing so would undermine Harvey's cooperation agreement. (See Pet'r. Br. at 62.) Indeed, when prosecutors contacted them during trial, Harvey and his mother both denied that Harvey had made the statement. (Tr. 1226.) According to petitioner, earlier disclosure would have given defense counsel the chance to pursue leads and potentially develop exculpatory evidence before Harvey's story was set in stone through his agreement to testify.

Respondent argues that it is implausible and "entirely speculative" that Harvey's mother would have implicated her son as the shooter if the defense had contacted her earlier. Petitioner suggests, in response, that Harvey's mother might have thought it was beneficial early on to present the story that Harvey had the gun but did not intend to hurt anybody. Indeed, the fact that

Harvey's mother told Sonja Pierce shortly after the shooting that "she heard that Keemie said that he had the gun," (Tr. 1225) indicates that there was a point in time when Harvey's mother was willing to convey that story at least to a friend of hers. According to Detective Bond, there was nothing equivocal about the information he received from Officer Pierce. (See Tr. 1104-05.)

The question, then, is whether these facts create a "reasonable probability," not merely a "possibility," that the defense could have developed Officer Pierce's tip into admissible evidence to use at trial in order to establish Harvey as the shooter. In considering petitioner's direct appeal, the Appellate Division held that "[t]here was no indication that a reasonable possibility existed that earlier disclosure of the material might have led to a different outcome of the trial." People v. Watson, 793 N.Y.S.2d 89, 90 (N.Y. App. Div. 2005). Although it is a close question, this Court cannot conclude that this state court decision was an unreasonable application of federal law. Accordingly, under AEDPA, the Court finds that petitioner's Brady claim does not require granting his petition for a writ of habeas corpus on the basis of the potential, had it been disclosed earlier, to develop the suppressed material into admissible evidence for trial.

This conclusion is independent of the usefulness of the suppressed evidence for cross-examining Detective Bond. As discussed above, the Supreme Court has made clear that evidence is favorable and material if it could be used in cross-examination to undermine the thoroughness of the police investigation. See Kyles, 514 U.S. at 442 n.13, 445-47, 115 S. Ct. at 1569, 1571-72. This case presents an unusual analytical problem, however, because although the evidence was disclosed in time to use it in cross-examination, such cross-examination was not allowed. The Court thus has found it appropriate to analyze the evidence's impeachment uses under the confrontation clause rather than according to Brady's due process analysis.

## III. Conclusion

On the facts of this case, there is no question that petitioner is guilty of second degree murder for his role in an armed robbery that caused the victim's death. Petitioner was only convicted, however, of the single more serious charge of first degree murder. This Court concludes that this more serious conviction was obtained in violation of the Confrontation Clause as the Supreme Court has applied it in <u>Davis v. Alaska</u>, 415 U.S. 308, 315, 95 S.Ct. 1105, 1110 (1974), and that the state court decision to the contrary which upheld petitioner's conviction involved an unreasonable application of this clearly established federal law.

Accordingly, the petition for a writ of habeas corpus is granted. Respondent is directed either to retry petitioner or to release him within ninety (90) days of this order. The judgment is stayed until all federal appellate proceedings are completed.

SO ORDERED.

Dated: Brooklyn, New York
December 28, 2009

s/Hon. Carol B. Amon
_____
Carol Bagley Amon
United States District Judge

–67–